# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  47763-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| SHANE A. DELORENZE | |
| Appellant. | |

BJORGEN, C.J. — Shane Delorenze appeals his conviction for second degree rape.  He argues that (1) there is insufficient evidence to support the elements of sexual intercourse and of the victim's incapability of consent due to mental incapacity or physical helplessness; (2) the State engaged in prosecutorial misconduct in rebuttal argument by stating "[p]lease do your job," and by calling the defense's arguments "farfetched" and "absurd"; and (3) he received ineffective assistance of counsel because his attorney failed to object to portions of an audio recording containing improper opinion testimony and to the prosecutor stating "[p]lease do your job."  We hold that sufficient evidence supports both challenged elements of the offense and that Delorenze fails to establish prosecutorial misconduct or ineffective assistance of counsel.  Accordingly, we affirm.

FACTS

I. JUNE 20 INCIDENT

On June 20, 2014, Jennifer Ashley had a birthday party at the home she shared with her husband, Eddie Ashley. Numerous individuals attended, including Ryan Jefferies and Jeffries' friend, Delorenze, whom the Ashleys did not know. Throughout the evening, Jennifer[1] and the other attendees quaffed beer, wine, and hard liquor. Delorenze was "always in [Jennifer's] face" and encouraged her to take shots of alcohol. Report of Proceedings (RP) at 305. Jennifer was a "light[]weight," meaning she rarely drank alcohol, and she became highly intoxicated. RP at 309. After drinking for many hours, Eddie took her upstairs to the master bedroom, where she vomited. Jennifer went to bed and Eddie returned downstairs to entertain the remaining guests, which included Jeffries and Delorenze.

While Eddie and Jeffries were in the kitchen talking, they suddenly heard a "thump" come from upstairs. RP at 179. They realized that Delorenze was not with them and rushed upstairs, finding Delorenze naked from the waist down on top of Jennifer. Her legs were spread apart and Delorenze was thrusting at the hips into her. Eddie shouted, "What the f***!" prompting Delorenze to fly like a "bat out of hell" from the room. RP at 181. Eddie told Jeffries to leave with Delorenze, which he did after recovering Delorenze's underwear from the bedroom floor.

Eddie approached Jennifer on the bed and yelled, "What the f*** are you doing?" RP at 182. She was unresponsive. Eddie continued trying to rouse her by yelling, but was unsuccessful. He then slapped Jennifer across the face several times, which caused her to wake

---

[1] We refer to Jennifer Ashley and Eddie Ashley by their first names to avoid confusion throughout this opinion. No disrespect is intended.

from her stupor and ask, "What? What?" RP at 182-83. Eddie explained that there had been another man on top of her. Jennifer saw a pair of sandals on the floor, later found belonging to Delorenze, and, after a short conversation with Eddie, Jennifer stated, "I was just raped." RP at 183.

Eddie called 911, and Jennifer was transported to the hospital where samples of her blood and urine were taken. After confronting Delorenze in a parking lot, police officers transported him to a police station where he was interviewed about the incident. Delorenze voluntarily provided a swab sample from his penis shaft and head to police officers for deoxyribonucleic acid (DNA) testing.

## II. PROCEDURE

Delorenze was charged by amended information with second degree rape. At his trial, Jennifer, Eddie, Jeffries, and responding police officers testified to the facts above. Jennifer further described what she perceived during the incident with Delorenze:

> I remember hearing Eddie's voice say what the fuck. And I remember thinking this is a weird dream. And then I felt a pressure lift off me. And I'm still thinking it's a dream. And I'm not thinking anything of it. I just heard my husband's voice. And then all of a sudden I hear, Jennifer, wake up. I'm like -- I'm slapped. And I was like, ouch. This dream sucks. And then I heard, Jennifer, wake up. And I think I was slapped a third time. And I was like, what?
> Finally I'm like, okay, this isn't a dream. This is -- what -- what is it? He's like, Jennifer, another dude was just inside you.

RP at 312.

1.   Expert Testimony

The State called two expert witnesses during the trial. Rebecca Flaherty, a forensic scientist with the Washington State Toxicology Lab, testified that based on Jennifer's urine and

3

blood samples, she had between a .096 to .11 blood alcohol level at the time of the incident with Delorenze. Flaherty also testified that an individual's "tolerance," which depends on the extent to which a person drinks alcohol on a regular basis, could minimize or enhance the effects of alcohol. RP at 278. She also testified that depending on a person's level of "fatigue" or lack of sleep, alcohol could make an individual go into a "sedated state." RP at 280.

Laura Kelly, a forensic scientist with the Washington State Patrol, testified about her results derived from testing Delorenze's penile swab provided to police. She testified that the penile swab had a DNA profile mixture consistent with originating from two individuals. The major component, or more than 75 percent, matched Jennifer's DNA. Kelly opined that there was a 1 in 2.4 quintillion chance that the DNA was from somebody different than Jennifer. Kelly also testified that she tested a vaginal endocervical swab from Jennifer, which did not indicate the presence of any male DNA.

2.     Admission of Delorenze's Interview

Also during trial, the State admitted an audio recording of Delorenze's interview with Jeremy Free, a police officer with the Vancouver Police Department, conducted shortly after his arrest. Throughout the interview, Delorenze expressed confusion and a lack of memory regarding the incident with Jennifer. In the interview recording, Free made the following statements:

> [Free]: Okay. Do you understand if the prosecutor decides that this [will] go to trial, and a jury hears you talking saying what you're saying, they're probably not going to buy your story? That most people don't drink to the point where they have no memory, but yet they can function at -- you know, performing an action like this. Understand what I'm saying?
>
> You got multiple witnesses saying that they caught you in the room. You got a victim saying it as well. You're saying you have no knowledge of it, but yet you're able to perform these functions. Your body is able to, you know, go up into this room and undress and do these things to this girl, and yet you're claiming that you have no knowledge of it.

4

I find it hard to believe, and I can almost guarantee that a jury would find that hard to believe. I think the best thing you need to do at this point is to tell the truth on what you know.

RP at 450-51.

[Free]: Because I don't buy that [you don't recall what happened] at all. That I don't recall, that doesn't cut it with me. And I guarantee you a jury is not going to buy it. So you need to tell me what happened in that room. We already know you had sex with this girl. We just need to know what was said.

RP at 452.

[Free]: And you're going to have all these people, you know, saying this in front of the jury.
. . . .
And they're not going to buy your story that I don't remember because if you're able to function to have sex with this girl, you're going to have a memory of it. You're not to the point where you're just blacking out and everything if you're able to make those decisions and actually have sex with this girl. So I don't remember, I don't buy it.

RP at 454.

[Free]: Okay. Well, understand that the allegations have been made of rape. Okay. And there's a victim. There's witnesses to what was told that they walked in on it. And you're here at this point. We have your underwear. And that's where we're at.
So I was hoping maybe you would share your side of the story because there's always two sides of the story. I don't necessarily believe your story, what you're telling me on you don't remember.

RP at 459. Defense counsel did not object to these portions of the audio recording.

During cross-examination of Free, defense counsel elicited the following from him

regarding his interview with Delorenze:

[Defense Counsel]: Okay. So in the interview that we just heard, you told Shane that you knew that he had already had sex with Jennifer?
[Free]: Yeah, I believe that was part of the interview.
[Defense Counsel]: Okay. But that wasn't true; was it?

5

[Free]: Yeah, I don't think it was true. I don't think we would have known at the time.

. . . .

[Defense Counsel]: So you didn't know whether or not he had sex with Jennifer?

[Free]:. Yeah, I don't recall specifically if I knew or not. I may not have known.

. . . .

[Defense Counsel]: So in the interview, you . . . also told Shane that . . . multiple people had witnessed him having sex. But that wasn't true either; was it?

[Free]: Yeah, I believe that was not true.

. . . .

[Defense Counsel]: You were told -- you told him that he took off his underwear and tried to hide it?

[Free]: Yes.

[Defense Counsel]: But that wasn't true?

[Free]: Yes.

[Defense Counsel]: Okay. And you did all of that -- you did all of these questions and said all of these things that weren't true in an effort to pressure him into saying something or to confess to something; is that -- that's correct, right?

[Free]: Yes.

RP 478-81.

In closing argument, defense counsel told the jury:

[W]e've got Shane who has been transported . . . to a precinct . . . and gets interviewed. And you heard the interview. *We didn't object to that coming in. You needed to hear what he had to say that morning.*
He genuinely didn't remember any of it.

RP at 606 (emphasis added).

3.    State's Rebuttal Argument

After the defense's closing argument, the prosecutor argued the following to the jury in

rebuttal:

[Prosecutor]: Ladies and Gentlemen, this really is one of those cases where when you first look at it, you're like, you know, the evidence is all there. Okay. It is just so obvious what happened. And you think about it, and you think about it, and you have to come up with how the Defense is going to approach this case and explain away the evidence.
And I've listened to their argument. I've listened to their theories. You all heard the same. And as we stand here today -- or sit, we're still waiting for a

6

defense theory that makes sense. *Everything that Defense has advanced up to this point has been so absurd.*

RP at 615-16 (emphasis added). At this point, defense counsel objected on the basis of the prosecutor giving his opinion, but the court overruled that objection. The prosecutor then continued:

> [Prosecutor]: *It has been so absurd, so farfetched it makes no sense whatsoever.* Defense can't explain away – or explain -- I mean, the most crucial damning piece of evidence is Jennifer's DNA on the defendant's penis. And what do they come up with? Oh, could be from touch. Could be from, you know, other sources. Could be from her bed. Could be from her knee. Where is the evidence for that? There's no evidence of that.
> The other theory that they advanced is that, oh, they were making out. Where is the evidence of that? This was the first time that this guy was in their house. Why would she make out with him? It didn't happen.

RP at 616-17 (emphasis added). Then, at the very end of closing argument, the prosecutor stated:

> Ladies and Gentlemen, the evidence is clear, it's conclusive, it's strong, proof beyond a reasonable doubt the defendant did have sexual intercourse with Jennifer Ashley at a time when she was incapable of consent. *Please do your job.* Find the defendant guilty.

RP at 617 (emphasis added). Defense counsel did not object.

4.      Verdict

After trial, the jury found Delorenze guilty of second degree rape. He appeals.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Delorenze argues that the State failed to present sufficient evidence to support the elements of sexual intercourse and of Jennifer's incapability of consent due to mental incapacity

7

or physical helplessness. We disagree.

1.      Legal Principles

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any reasonable juror to find the essential elements of the crime beyond a reasonable doubt. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a juror can draw from that evidence. *Id.* All reasonable inferences from the evidence must be drawn in favor of the State and interpreted strongly against the defendant. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Circumstantial evidence is no less reliable than direct evidence. *State v. Ozuna*, 184 Wn.2d 238, 248, 359 P.3d 739 (2015). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

> Under RCW 9A.44.050,
>
> (1) A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person:
> . . . .
> (b) When the victim is incapable of consent by reason of being physically helpless or mentally incapacitated.

RCW 9A.44.010 provides the following definitions for "sexual intercourse," "mental incapacity," and "physically helpless":

> (1) "Sexual intercourse" (a) has its ordinary meaning and occurs upon any penetration, however slight, and
> (b) [a]lso means any penetration of the vagina . . . however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex.
> . . . .
> (4) "Mental incapacity" is that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act

of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause.
(5) "Physically helpless" means a person who is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

2.    Sexual Intercourse

Delorenze argues that there is insufficient evidence to support the element of sexual intercourse. We disagree.

The record reflects that Delorenze was observed naked from the bottom down, thrusting at the hips between Jennifer's legs. This alone is evidence from which a jury could reasonably infer that Delorenze penetrated Jennifer. In addition, Kelly testified that more than 75 percent of the DNA found on Delorenze's penile swab originated from Jennifer with only a 1 in 2.4 quintillion chance that the DNA originated from somebody else. We acknowledge that this DNA evidence alone does not show penetration. That evidence, however, coupled with the witness observations of Delorenze thrusting between Jennifer's legs, provides sufficient evidence for a reasonable juror to infer that Delorenze penetrated Jennifer's vagina with his penis.

Delorenze points to conflicting evidence, including that no bodily fluids were found on the bed sheets and that Jennifer's vaginal endocervical swab had no male DNA on it. We, however, must defer to the jury on issues of conflicting evidence. *Thomas*, 150 Wn.2d at 874-75. Given that, we find that the State provided sufficient evidence to support the element of sexual intercourse. Accordingly, this claim fails.

3.    Incapability of Consent

Delorenze next argues that there is insufficient evidence to support the element of incapability of consent due to mental incapacity or physical helplessness. We disagree.

9

Witness testimony indicated that Jennifer had a low tolerance to alcohol and that she drank many different types of alcoholic beverages throughout the night. Eddie testified that toward the end of the night, he had to take Jennifer to the master bedroom where she vomited. Further, he stated that after Delorenze left, Jennifer would not respond to his repeated shouting and would not wake up until he slapped her. Jennifer stated that she felt like she was in a dream until Eddie woke her up by shouting and slapping her. Flaherty testified that Jennifer's blood and urine samples reflected that she had between a .096 to .11 blood alcohol level at the time of the incident. She also testified that the presence of alcohol and fatigue could make a person go into a "sedated state." RP at 280. The aggregate of this testimony provides sufficient evidence to establish that Jennifer lacked the ability to consent when Delorenze penetrated her because she was mentally incapacitated or physically helpless.

Delorenze argues that the evidence is insufficient to show mental incapacity or physical helplessness because Jennifer stated in the 911 call that she thought maybe it was Eddie that penetrated her. Again, though, we defer to the jury on issues of conflicting evidence. *Thomas*, 150 Wn.2d at 874-75. Jennifer's compromised state due to alcohol and inability to perceive the incident demonstrate that her condition made her either unable to "understand[] the nature . . . of . . . sexual intercourse . . . [due to] the influence of a substance" or "unable to communicate unwillingness" to the sexual act. RCW 9A.44.010(4), (5). Thus, the record supplies sufficient evidence for the element of incapability of consent. Accordingly, this claim fails.

## II. PROSECUTORIAL MISCONDUCT

Delorenze next argues that the State engaged in prosecutorial misconduct in rebuttal argument by asking the jury to "[p]lease do your job" and by calling the defense's arguments "farfetched" and "absurd." Br. of Appellant at 12-13. We disagree.

1. Legal Principles

To establish prosecutorial misconduct, the defendant must prove that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

Depending on whether the defendant objected to the improper comments, we analyze prejudice in misconduct claims under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, he need only show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Id.* If, however, the defendant did not object at trial, he is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Id.* at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

2. "Please Do Your Job"

Delorenze argues that the prosecutor engaged in misconduct because he asked the jury during rebuttal argument to "[p]lease do your job." Br. of Appellant at 11-12. As noted, Delorenze did not object to this remark. We hold that it was an improper comment, but not so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice.

a.       Impropriety

A request for a jury to do its job can be improper depending on the context in which the statement rests. For example, the statement becomes improper if it conveys to a jury that it would violate a juror's oath if she disagreed with the State's theory of the evidence, *State v. Coleman*, 74 Wn. App. 835, 838-39, 876 P.2d 458 (1994), or if it is said without reminding the jury that every element must be proven beyond a reasonable doubt. *State v. Schoepflin*, noted at 165 Wn. App. 1020 (2011) (unpublished) (citing *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999)). Our United States Supreme Court has taken an even more cautious approach, warning that "exhort[ing] the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice." *United States v. Young*, 470 U.S. 1, 18, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

Here, the prosecutor's "[p]lease do your job" remark was improper. First, we recognize that his call was in the form of a plea ("[p]lease"), heightening the force of the request. Further, although the prosecutor references the beyond a reasonable doubt standard, he framed it as a burden that had already been carried by the "clear," "conclusive," and "strong" evidence the State had presented. RP at 617. Finally, immediately after requesting the jury to do its job, the prosecutor asked the jury to "[f]ind the defendant guilty." *Id.* However, the jury's job is not to find a defendant guilty, but to weigh the evidence and arguments from both sides and determine if the State has met its burden in proving the charged crime beyond a reasonable doubt.

For these reasons, we hold that the "[p]lease do your job" remark was improper argument.

b.      Prejudice

Because Delorenze did not object to this comment, we examine whether it resulted in a substantial likelihood of prejudice and whether a curative instruction may have obviated any prejudicial effect. *Emery*, 174 Wn.2d at 760-61.

In *Coleman*, 74 Wn. App. at 838, the manner in which the prosecutor told the jury to do its job implied that if they did not believe the State's evidence, they would be violating their oaths as jurors. Despite the impropriety of this argument, the *Coleman* court found no substantial likelihood of prejudice, in part, because it was only a single instance of misconduct and because of the weight of the evidence presented at trial. *Id.* at 841.

Here, like *Coleman*, the prosecutor only stated "[p]lease do your job" one time and did not repeat his admonition to the jury. Further, the State presented testimony including direct observations of the incident and physical evidence from which the jury could reasonably infer that Delorenze penetrated Jennifer, who could not consent due to her incapacitated state. Finally, the jury was instructed that "[y]ou must reach your decision based on the facts proved to you and on the law given to you," Clerk's Papers at 10, which included a burden of proof instruction discussing beyond a reasonable doubt. The combined effect of these considerations tempered the harm that resulted from the prosecutor's improper comment. Although we do not condone the prosecutor's argument, the "[p]lease do your job" remark was not so flagrant and ill-intentioned that incurable prejudice resulted.

Accordingly, this claim fails.

3.      "Farfetched" and "Absurd"

Delorenze next argues that the prosecutor disparaged defense counsel by referring to the defense's arguments as "absurd" and "farfetched." Br. of Appellant at 12-13. Assuming, without deciding, that these comments disparaged the defense, we find no substantial likelihood of prejudice.

Because Delorenze objected to these comments, but was overruled, we examine whether the "misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. The State argues that given the evidence in the case, witness observations of Delorenze thrusting while on top of Jennifer and her DNA found on his penile swab, the comments were not substantially likely to have affected the verdict. We agree. With the observational and scientific evidence from which the jury could rationally infer that Delorenze penetrated Jennifer and that she lacked the ability to consent, there was not a substantial likelihood that the assumed improper disparagement of counsel would have affected the jury's verdict. Accordingly, this claim fails.

4.      Cumulative Error

Delorenze also argues that the combined prejudicial effect from the prosecutor's "[p]lease do your job," "farfetched," and "absurd" comments warrants reversing his conviction. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. Here, Delorenze did not object to the "[p]lease do your job" comment, and as previously observed, the resulting prejudice was minimal and a jury instruction would have cured any prejudicial effect. Further, as previously analyzed, any prejudice from the "farfetched" and "absurd" comments was

so small that no substantial likelihood of prejudice manifested. Given this, we conclude that the combined effect from these improper remarks did not create the requisite prejudice necessary to establish cumulative error.

Accordingly, this claim fails.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Delorenze argues that he received ineffective assistance of counsel because his attorney failed to object to an audio recording containing improper opinion testimony and to the prosecutor stating "[p]lease do your job" in rebuttal. We disagree.

1.      Legal Principles

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance claim predicated on a failure to object, a defendant must show that: (1) counsel's failure to object fell below prevailing professional norms, (2) the trial court would likely have sustained the objection if counsel made it, and (3) the result of the trial would have differed if the trial court excluded the evidence. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). "The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). We presume "that the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed. *Grier*, 171 Wn.2d at 34. "Only in egregious circumstances, on

15

testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763.

2.      Opinion Testimony

Delorenze argues that defense counsel had no legitimate trial strategy in failing to object to the portions of the audio recording where Free opined on Delorenze's guilt. We disagree.

"Opinions on guilt are improper whether made directly or by inference." *State v. Quaale*, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). Police officers' opinions on guilt are particularly harmful because they carry an "'aura of reliability.'" *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008) (quoting *State v. Demery*, 144 Wn.2d 753, 765, 30 P.3d 1278 (2001)).

Here, Free's statements in the audio recording repeatedly characterized Delorenze's story as unbelievable. Further, Free opined that a jury would likely not believe Delorenze's version of the events. Arguably, these statements communicated to the jury that Free believed Delorenze was guilty. However, defense counsel in closing argument expressed that he did not object to the audio recording because the jury "needed to hear what [Delorenze] had to say that morning. He genuinely didn't remember any of it." RP at 606. Such a statement demonstrates defense counsel's legitimate tactic in getting Delorenze's side of the story into trial without having him testify and be subject to cross examination. In addition, defense counsel in cross-examination repeatedly impeached Free's interrogation tactics, showing to the jury that he had no basis for his opinion regarding how Delorenze would fare at a trial. Thus, the record demonstrates that defense counsel allowed Free's opinions to come in as a way to later impeach him on cross-examination and to buttress Delorenze's overall defense.

Because counsel had a legitimate trial strategy in declining to object to the audio recording, this claim of ineffective assistance fails.

### 3. "Please Do Your Job"

Delorenze next argues that he received ineffective assistance of counsel because the defense failed to object to the prosecutor stating "[p]lease do your job." Although it was deficient not to object, we hold that there was not a reasonable probability that an objection would have changed the result of trial.

As determined in Part II, the prejudice from "[p]lease do your job" was abated because (1) the State only stated it once, (2) the State presented observational and scientific evidence supporting that Delorenze penetrated Jennifer when she lacked the ability to consent, and (3) the jury was instructed to reach a "decision based on the facts proved to you and on the law given to you" and that the State must prove each element of second degree rape beyond a reasonable doubt. Clerk's Papers at 10, 12. For the same reasons, we conclude that a sustained objection to "[p]lease do your job." would not have created a reasonable likelihood of a different result in Delorenze's trial.

Accordingly, this claim fails.[2]

### 4. Cumulative Error

Delorenze argues that the cumulative prejudice derived from the improper opinion testimony and "[p]lease do your job" resulted in an unfair trial. Br. of Appellant at 19-20. However, as outlined above, defense counsel had a legitimate trial tactic in not objecting to the

---

[2] Delorenze also argues that he received ineffective assistance of counsel because his attorney failed to object to the "farfetched" and "absurd" remarks. *See* Br. of Appellant at 19. However, his attorney did object to those comments, but was overruled. Because defense counsel objected, this argument does not show ineffective assistance of counsel.

opinion testimony, and therefore, we do not consider any prejudice resulting from it. Further, although defense counsel was deficient for failing to object to "[p]lease do your job," we determined above that the prejudice from that did not create a reasonable likelihood of changing the result of trial.

Accordingly, this claim fails.

## CONCLUSION

We hold that sufficient evidence supports the challenged elements of second degree rape and Delorenze fails to establish prosecutorial misconduct or ineffective assistance of counsel. Therefore, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, C.J.

BJORGEN, C.J.

We concur:

Johanson, J.

JOHANSON, J.

Melnick, J.

MELNICK, J.