# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE SEP 17 2015



Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Sep 17, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ADRIAN BENTURA OZUNA,<br><br>Petitioner. | NO. 90666-1<br><br>EN BANC<br><br>Filed   SEP 17 2015 |

STEPHENS, J.—Adrian Ozuna challenges the sufficiency of the evidence supporting his conviction for intimidating a former witness. A person commits that crime if he "directs a threat" to a former witness because of the witness's role in an official proceeding. RCW 9A.72.110(2). The statute defines a "threat" to mean "[t]o communicate, directly or indirectly, the intent" to harm another in various ways. *Id.* at (3)(a)(i); *see also id.* at (3)(a)(ii) (incorporating a similar definition of "threat").

Ozuna contends the jury impermissibly convicted him based only on a letter he wrote that authorities confiscated before it was delivered to anyone. We disagree

and conclude that a rational jury could have found Ozuna guilty of the crime based on circumstantial evidence presented at trial. We affirm.

## I. BACKGROUND

### A. Trial Evidence

The testimony at trial established the following facts. In June 2010, Ozuna was incarcerated in the Yakima County Department of Corrections (Yakima County Jail). Ozuna was awaiting sentencing for a prior conviction. The conduct underlying that conviction involved Augustine Jaime Avalos, a member of the same gang as Ozuna. Avalos had testified against Ozuna in Ozuna's underlying trial and was also incarcerated in the Yakima County Jail.

On June 8, when Ozuna was moved from one prison cell to another, a corrections officer found two unstamped, unsealed letters in his possession. The officer confiscated the letters because Ozuna was not allowed to have the letters in the new cell and because the envelope in which they were found listed a return address for another inmate, Marc Cole. A handwriting expert testified that Ozuna wrote the letters. Ozuna later conceded he wrote the letters. 1 Tr. of Proceedings (TP) at 547 (concession in closing argument); Appellant's Reply Br. at 1 ("Ozuna does not contest the fact that he wrote the letters.").

One letter is not relevant to this case. The other letter is relevant and was admitted into evidence. The letter is addressed to "Primo" and signed by "Primo," meaning cousin. It is undated. The letter reads in part:

Ey homie, I just got your [unreadable]. Well it was a blessing to hear from you. It put's a smile on my face to know that your ready to ride for me. . . . [A]s you already know, I [agreed to a plea deal for] 10 years 9 months cause of a pussy that don't know how to ride or Die. He would rather break weak than to honor our sacred code of silence. He is now marked a rat and a piece of shit in my book. He has sealed his fate and now it's just a matter of time. He rode with me and was given my trust and he decided to dishonor that privaledge . . . . [A]ll I can say for that fool is, you know what time it is. You guys let him live in luxery for way to long already . . . [H]ow can you live with a rata like that and still be able to rest in peace in that puto's presence? I hope and pray for satisfaction before I leave this building and may that fool suffer and Die in his rat hole. Fucken snitch bitch rat! . . . That puto took 10 years of my life and a fucken leva from my barrio, "my big homie" "Gorge" [is] living in the same house as him . . . . Gorge could of did something but just decided to let that puta slide and live under the same roof with him. . . . Tell that fool he's a piece of shit just like him. Let'em know that this is Campana Gang! He put's the crack in our bell. No loyalty, no honor, no heart! . . . Tell'em he's as good as dead to me.

[L]et that fool feel the wrath and let'em know the rata that he is and tell'em that I siad that bad things come to those that snitch. May he rest in piss . . . So now you know what I want primo, don't hesitate vato. Take action, reep the rewards later. Don't think, just act. . . . Hit me up later after the shit get's handled. Do it on the 25 cause that's when I have court, [and] I want to have a smile on my face that day knowing that . . . fool's getting a lil taste of what's coming to him. The 25 is the day I get sentenced. Good looking out Primo, don't let me down fucker! . . . Tell'em that Vanessa's gonna be the one to set him up for us, mark my words! Show him how set ups are done. There just waiting for him to get out. . . . Lol. . . . Satisfaction will be mine! Let'em know that he fucked up.

State Ex. 1D at 1-4 (in evidence folder in the record). The State produced ample testimony confirming that "[t]here was a threat to another person in [the letter]." 1 TP at 269; *see also, e.g., id.* at 278-85, 318-21 (discussing threatening nature of the letter). However, no evidence established that the letter was delivered to anyone before the officer confiscated it.

On June 22, a detective showed the undelivered letter to Avalos. The detective believed Ozuna's letter targeted Avalos, and the detective was concerned for Avalos's safety because Avalos was a former gang member with Ozuna and had

testified against him. The detective had investigated Ozuna's underlying crime and was present during trial. On the day the detective showed Avalos the letter, she also conducted a recorded interview with him. The content of that interview was not admitted as substantive evidence at trial.

On June 25, the day Ozuna was scheduled to be sentenced for the underlying conviction, Ozuna used a prison phone to call his father. The call was recorded, admitted into evidence, and played to the jury. During the call Ozuna stated, "[T]hey wrote me up for tampering with a witness—or not tampering—threatening a witness." *Id.* at 390. Ozuna then said he thought "they're going to show the letter to the [sentencing] judge or some shit," so he said he was going to "be prepared [for the sentencing hearing] and I'm like hey man, you've got to understand, you know, I'm dong ten years because of this gato and I was mad and—[inaudible on tape—language]—you know? Try to just set that whole shit down. Hey, I wrote it in—in a time of passion and, you know?" *Id.* (third alteration in original). Later that day, Ozuna attended his sentencing hearing and was sentenced to 10 years and 9 months in accordance with his plea agreement. The record does not reflect whether the confiscated letter was discussed at the hearing.

On July 9, another inmate in the same prison, David Soto, assaulted Avalos while in a courthouse holding room. Avalos received stiches at the hospital for his injuries. The inmates who were present when Avalos was injured were not cooperative. No evidence suggests that Ozuna was present during the assault.

At Ozuna's intimidation trial, the State produced testimony that Ozuna and Soto are members of, and Avalos is a former member of, the gang called the Sureños. Their gang is also referred to by its subgroup, the Bell Garden Lokotes or BGL, within the larger organization of the Sureños.

Avalos testified at Ozuna's intimidation trial. A reasonable jury could view his testimony as evasive. The State attempted to impeach his credibility with questions based on his recorded interview given to the detective on June 22. For example, when Avalos was asked, "And you received some verbal threats?," he testified, "Like I said, people talk a lot through their doors." *Id.* at 422. He was asked, "Isn't it true that you said [in the recorded interview] you did receive a letter that stated that the homeys were waiting for you in a shelter . . . to take care of you?," but he responded, "I don't remember that, no." *Id.*

The State also produced expert testimony about gang culture from a Sunnyside Police Department officer who worked in the Yakima area and was knowledgeable about the local gangs, as well as the individuals at issue here. The expert was asked, "[A]re you aware of . . . a no snitch code within the BGL gang?" *Id.* at 437. He responded, "[I]t's not just the BGL gang, it's all of the gang members so I'm not going to clump just one; it's the whole entire culture of the gang culture. That is one of their main staples, the no snitch credo." *Id.* And the State asked, "If a gang member felt like another gang member snitched on them would it be likely to see some retaliation?" *Id.* at 443. He answered "Likely[?] [N]o, there will be." *Id.* The expert testified about the hierarchical decision-making structure of gangs,

explaining that, for a significant action—such as the retaliation against a former witness—to be taken, someone high in the gang must authorize the action or else it cannot proceed.[1] Ultimately, the officer testified about how the content of Ozuna's undelivered letter was consistent with gang culture.

Similarly, two other officers from the Yakima County Jail discussed the status of being a "shot caller" or "tank boss," meaning someone who has elevated decision-making authority within a gang or prison. *Id.* at 448; *see also id.* at 292, 456-59. One officer testified that Ozuna was a "shot caller" in the Yakima County Jail. *Id.* at 492; *cf. id.* at 459 (regarding a distinction between "posers" and shot callers and testifying Ozuna is "not a poser; he's—he's legit. He's the—he's in it").

After the State rested its case, Ozuna called an admitted Sureños gang member, Brandon Perren, as a witness. Perren testified that he and Ozuna were in the Yakima County Jail together and that they communicated via letters. He testified that after Ozuna's letter had been confiscated, Ozuna sent him a different letter instructing him to "leave [Avalos] alone." *Id.* at 476.

B. Procedural History

Before trial, Ozuna moved to dismiss the charge for lack of evidence pursuant to *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986). Defense counsel argued that "directing a threat at somebody means not keeping it to yourself; it means—directing it to somebody, not necessarily . . . to the intended victim, but *to*

---

[1] He acknowledged there have been instances where junior members act on their own initiative but stated that is not the norm and that the junior member could be punished by higher authorities in the gang for doing so.

*somebody.*" 1 TP at 20 (emphasis added). The judge believed there were disputed facts and denied the motion.

The trial ensued. After the State rested its case (evidence discussed above), Ozuna moved to dismiss the charge. Defense counsel argued that "there's no . . . evidence that [a threat] was communicated to anybody" and that "this element of the offense simply has not been addressed by the prosecution's case." *Id.* at 463. The judge denied the motion. The judge reasoned that *State v. Anderson*, 111 Wn. App. 317, 44 P.3d 857 (2002), and *State v. Hansen*, 122 Wn.2d 712, 862 P.2d 117 (1993), held that a communication does "not require that . . . the threat actually be communicated to the person who is the target of the threat." 1 TP at 465. Defense counsel retorted, "[But] [i]t has to be communicated *to somebody* though." *Id.* (emphasis added). The judge replied, "I'm not even sure that that's it; it *just has to be made* as far as I can tell from reading . . . those cases." *Id.* at 465-66 (emphasis added). Defense counsel offered a hypothetical situation about a person writing threatening language in his personal diary, and the diary then being discovered by police, to suggest this could not constitute communicating a threat. The judge said, "and that's what happened here"—but then denied the motion. *Id.* at 466.

The trial proceeded, and the jury returned a verdict convicting Ozuna of intimidating a former witness under RCW 9A.72.110(2). The trial court entered judgment and imposed an exceptional sentence of 10 years based on the jury's finding of gang-related aggravating factors.

Ozuna appealed to the Court of Appeals. He raised several issues, including challenges to the sufficiency of the evidence and the denial of his motion to suppress. The Court of Appeals affirmed in an unpublished opinion. *State v. Ozuna*, noted at 182 Wn. App. 1024, 2014 WL 3930471. Chief Judge Siddoway dissented on the sufficiency issue. 2014 WL 3920471, at *7-12. Ozuna petitioned for review, abandoning all of his contentions except the sufficiency of the evidence to prove he directed a threat. We granted review. *State v. Ozuna*, 181 Wn.2d 1023, 339 P.3d 635 (2014).

## II. DISCUSSION

### A. Legal Standard

A person is guilty of intimidating a witness "if the person directs a threat to a former witness because of the witness's role in an official proceeding." RCW 9A.72.110(2). The only disputed element in this case is whether Ozuna "direct[ed] a threat."[2] *Id.* The statute in turn defines "threat" to mean:

> (i) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or
> (ii) Threat as defined in *RCW 9A.04.110(27).[3]

*Id.* at (3). The cross-referenced statute defines "threat" to mean

to communicate, directly or indirectly the intent:

---

[2] The parties stipulated that "Augustine Jaime Avalos was a former witness in an official proceeding against the Defendant," Clerk's Papers (CP) at 144; *see also* 1 TP at 499, and the circumstances and evidence make clear that if Ozuna directed a threat, he did so because of Avalos's former testimony.

[3] The reviser's note explains that the asterisk in the statute reflects that the definition of "threat" in RCW 9A.04.110 has since been renumbered as subsection (28), not subsection (27).

> (a) To cause bodily injury in the future to the person threatened or to any other person; or
>
> . . . .
>
> (j) To do any other act which is intended to harm substantially the person threatened or another with respect to his or her health, safety, business, financial condition, or personal relationships.

*Id.* 9A.04.110(28). The statute does not define the word "communicate."

This court has not previously interpreted the intimidating a former witness statute, RCW 9A.72.110(2), but has interpreted the statute creating the crime of intimidating a judge, RCW 9A.72.160. *See Hansen*, 122 Wn.2d 712. The two statutes have an identical "directs a threat" element and use an identical definition of "threat." *Compare* RCW 9A.72.110(2), *with* RCW 9A.72.160. We therefore look to *Hansen* for guidance.

In *Hansen*, the defendant sought to sue the superior court judge who presided over his prior criminal matter. 122 Wn.2d at 714. He called various attorneys and, in one call, stated he was "'going to get a gun and blow them all away, the prosecutor, the judge and the public defender.'" *Id.* at 715. The attorney reported this comment to authorities. *Id.* Eventually Hansen was convicted of intimidating a judge under RCW 9A.72.160. *Id.* On appeal, the Court of Appeals held the statute required proof that Hansen intended or had knowledge that the threat would reach the threat's target, i.e., the judge. *Id.* at 716. We disagreed and held that whether Hansen intended the threat to reach the judge was irrelevant. *Id.* at 718. Instead, the communication of a threat to a third party (the lawyer) concerning the target (the judge) satisfied the communication element because the statute expressly includes

communications made "in an indirect fashion as well as direct threats." *Id.* We found sufficient evidence and affirmed Hansen's conviction. *Id.* at 718-19, 722.

The Court of Appeals has since adopted *Hansen*'s rule in the context of two similar crimes. *See Anderson*, 111 Wn. App. at 321-22 (regarding the crime of intimidating a former witness, RCW 9A.72.110(2)); *State v. Williamson*, 131 Wn. App. 1, 6, 86 P.3d 1221 (2005) (regarding the crime of tampering with a witness, RCW 9A.72.120). These cases all stand for the proposition that a threat need not be communicated to the threat's target but instead can be communicated indirectly to a third party.

Yet the trial court reasoned and the State suggests that the cases stand for something much broader—that a threat does not need to be communicated to *anyone*, i.e., that it is sufficient if the threat is uttered or written in private. We reject this notion. The very concept of a "communication" conveys the idea that something is communicated to someone. *E.g.*, BLACK'S LAW DICTIONARY 337 (10th ed. 2014) (defining "communication" as "the process of bringing an idea to another's perception"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 460 (2002) (defining "communication" as "the act or action of imparting or transmitting" and as "interchange of thoughts or opinions : a process by which meanings are exchanged between individuals through a common system of symbols (as language, signs, or gestures)"). In the context of another crime that uses the word "communicate" without defining it, we held that to "communicate" requires a message be both "transmitted by the person and received by the [recipient]." *State*

*v. Hosier,* 157 Wn.2d 1, 9, 133 P.3d 936 (2006) (regarding the crime of communication with a minor for immoral purposes under RCW 9.68A.090).

In short, a communication must be transmitted and received. *Id.* However, a person may "direct[] a threat" under the intimidation of a former witness statute, RCW 9A.72.110(2), without that threat being communicated to the threat's target. The threat may be transmitted to a third party. *Hansen,* 122 Wn.2d at 718; *Williamson,* 131 Wn. App. at 5-6; *Anderson,* 111 Wn. App. at 321-23. With this understanding of the relevant statutory elements in mind, we turn to the evidence presented at Ozuna's trial.

### B. Sufficiency of the Evidence

We review the sufficiency of the evidence to determine "whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. McKague,* 172 Wn.2d 802, 805, 262 P.3d 1225 (2011). We assume the truth of the state's evidence, *State v. Mines,* 163 Wn.2d 387, 391, 179 P.3d 835 (2008), view reasonable inferences from the evidence in the light most favorable to the state, *id.,* and deem circumstantial and direct evidence equally reliable, *State v. Myers,* 133 Wn.2d 26, 38, 941 P.2d 1102 (1997). Applying these principles, we conclude sufficient evidence was presented at trial for a rational jury to find that Ozuna directed a threat to a third party or to Avalos.

We first note that a rational jury could find Ozuna had the state of mind, motivation, and opportunity to direct a threat regarding Avalos. Avalos had been a longtime gang member with Ozuna, and Avalos testified against Ozuna. They were

-11-

incarcerated in the same prison. Ozuna had gang allies in the prison. Avalos had enemies. Testimony established the gang follows a strict "no snitch" code, enforced by violent retaliation. Ozuna's confiscated letter reveals his state of mind. It said, for example, "[L]et that fool feel the wrath and let'em know the rata that he is and tell him that I siad that bad things come to those that snitch. May he rest in piss." State Ex. 1D at 2. Additionally, the jury could consider the timing of Avalos's assault by a member of Ozuna's gang, David Soto. The evidence is sufficient insofar as it establishes Ozuna's state of mind, motivation, and opportunity to direct a threat regarding Avalos.

A rational jury could also rely on several pieces of circumstantial evidence to conclude that Ozuna directed a threat to Avalos or a third party.

Though Ozuna's confiscated letter was not delivered to anyone,[4] a reasonable inference from its content is that Ozuna had engaged in a *prior* conversation with the intended recipient of the letter. The letter opens, "Hey homie, *I just got your* [unreadable]. *Well it was a blessing to hear from you. It put's a smile on my face to know that your ready to ride for me.* . . . [*A*]*s you already know*, I [agreed to a plea deal for] 10 years 9 months cause of a pussy that don't know how to ride or Die." *Id.* at 1 (emphasis added). Drawing a reasonable inference in the State's favor, we

---

[4] We reject any suggestion that Ozuna delivered the letter to the corrections officer who confiscated it because Ozuna did not intend to communicate the letter to him. Though a communication to any third party is enough to satisfy the "directs a threat" element of intimidating a former witness under RCW 9A.72.110(2), as discussed above, the communication must be an intentional act.

find that a rational jury could view this evidence as establishing that Ozuna participated in a prior conversation directing a threat to harm Avalos.[5]

A rational jury could also rely on the expert testimony that gangs follow a hierarchical decision-making structure where serious actions, including witness retaliation, can occur only when someone with elevated decision-making authority in the gang directs the action to occur. An officer in the Yakima County Jail specifically testified that Ozuna was a shot caller or tank boss with such elevated decision-making authority. A member of Ozuna's gang later assaulted Avalos. Viewing a reasonable inference from this testimony in favor of the State, a rational jury could conclude that the only way Soto had authority to engage in the assault on Avalos was because Ozuna directed him to do so.

Further, a rational jury could conclude Ozuna directed a threat based on the testimony of Brandon Perren. Perren was also in the Yakima County Jail, and he admitted he was member of Ozuna's gang. Perren testified that he communicated with Ozuna in the prison through letters. Most importantly, Perren testified that after the officers confiscated Ozuna's letter, Ozuna sent him a different letter instructing him to "leave [Avalos] alone." 1 TP at 475. Perren testified that he "forward[ed] the] message" to an unspecified group of prisoners so that "they could leave him alone, anybody that came across him." *Id.* at 476. Viewing a reasonable inference

---

[5] The letter was confiscated on June 8, and the information charged that the crime occurred "[o]n, about, during or between" June 8 and July 9. CP at 1. Viewing a reasonable inference in the State's favor, a rational jury could have found that the prior communication happened earlier in the day of June 8 or otherwise "about" June 8.

in the State's favor, a rational jury could conclude that Ozuna's letter to Perren showed Ozuna exercising his authority as a shot caller in an attempt *to revoke his previously communicated directive* for Perren or others to harm Avalos.

A rational jury could also find that Avalos's testimony corroborates the theory that Ozuna directed others to harass Avalos. For example, this exchange supports that Avalos received threats:

> Q. And you received some verbal threats?
> A. Like I said, people talk a lot through their doors. I mean, it happens all the time.
> Q. Okay. How—how were you threatened?
> A. Well, it—I mean he—you—people yell things through the doors and you can't see who it is, they just yell things out.

*Id.* at 422. Though Avalos never testifies who was responsible for the threats, a rational jury could infer from the evidence that Avalos was harassed and assaulted and that it was the shot caller with the motivation to retaliate against Avalos who directed the harassment and violence.

Considering the totality of the evidence and viewing the reasonable inferences in the State's favor, we conclude sufficient evidence allowed the jury to find Ozuna committed the crime of intimidating a former witness.

## III. CONCLUSION

We hold that a defendant "directs a threat" under RCW 9A.72.110(2) when he communicates a threat to someone, though not necessarily the intended victim of the threat. Viewing the reasonable inferences in the State's favor, we hold that

sufficient circumstantial evidence was presented at trial to permit a rational jury to find that Ozuna committed the crime of intimidating a former witness. We affirm.

Stephens, J.

WE CONCUR:

Madsen, C.J.

Wiggins, J.

Johnson, J.

González, J.

Owens, J.

Gordon McCloud, J.

Fairhurst, J.

Yu, J.