# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48814-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| EMANUEL J. MOORE, | |
| Appellant. | |

BJORGEN, C.J. — Emanuel J. Moore appeals his conviction of second degree promoting prostitution. He argues that (1) his counsel was ineffective for failing to object to text message evidence; (2) there is insufficient evidence to support that he knowingly advanced or profited from prostitution; and (3) the trial court erred in giving a unanimity instruction after juror deliberations had begun. Moore also raises several claims in a statement of additional grounds (SAG). Because Moore fails to show a prejudicial error based on these contentions, we affirm.

## FACTS[1]

In 2014, Michaela Fish met Moore, whom she refers to as "Boss" or "Bos$," variations of Moore's musician name, "Boss Pain." Report of Proceedings (RP) at 213-14, 427. At some point, Fish lost touch with Moore and began engaging in prostitution in Seattle. Her pimp in Seattle was abusive, which prompted her to run away and find Moore in January 2015. When

---

[1] In its briefing, the State cites to several exhibits that were admitted at Moore's trial. Those exhibits were not included in the record on appeal. Although not necessary for the disposition of the case, we remind the State that when it cites to evidence in its brief, it should confirm that the cited evidence is in the record on appeal.

Fish found Moore, he told her that he would "take care" of her. RP at 225. Moore paid for a room for Fish to stay in at the Western Inn Hotel in Lakewood.

Fish used that hotel room to engage in prostitution and advertised to prospective customers through Backpage.com. Fish would "hide" some of the money from her dates but would give the rest to Moore. RP at 233-34. If Fish had a bad feeling about certain customers, she would ask Moore to stay close so that he could protect her. Fish would sometimes pay Moore extra money for his help and trouble, "like paying homage." RP at 236. Moore allowed Fish to use his phone, which had an associated phone number ending 4727, "to set up dates[2] and get money." RP at 227. After two car accidents, one in October 2014 and one in January 2015, Moore reported the 4727 phone number as his contact number to police. In some of Fish's Backpage.com ads, the 4727 phone number was used.

On January 29, 2015, David Crommes, a sergeant with the Lakewood Police Department, working undercover, found Fish's escort ad on Backpage.com with the following title: "New, Young and Sexy (Super Seductive) . . . – [age] 19." RP at 167. Included with the ad were provocative photos of Fish. Crommes texted the phone number associated with the post, which ended in 5529, asking to set up a date.

Crommes and Fish texted and talked over the phone, agreeing to meet before their date at the Western Inn Hotel. Police observed Moore leave Fish's hotel room before she contacted Crommes. Crommes went to the hotel, where Fish met him in the parking lot. Crommes and

---

[2] As used at Moore's trial, a "date" refers to an arrangement where an individual pays someone money for sex. RP at 185. Throughout the remainder of this opinion, any reference to a "date" has this meaning.

Fish discussed the specifics of their date, including that Fish was willing to go "Greek,"[3] if Crommes paid more money. RP at 174-75. Crommes told Fish that he would get ahold of her later to complete the date.

The next day, Crommes attempted to contact Fish at the 5529 number, but was unsuccessful. Crommes returned to Backpage.com and found an ad authored by "Heaven," which had the same provocative photos of Fish from the previous ad. RP at 177-80. However, there was a new phone number associated with this ad, ending in 8632. Crommes dialed the new number, Fish answered, and they agreed to meet in an hour.

Ten minutes before their date was to begin, Crommes received a text from Moore's 4727 number while Crommes was in the hotel parking lot. The text stated, "Baby, I got a new number. Text me on this phone. I will be available at 3:45, Heaven." RP at 184. Crommes texted back that was fine. Crommes continued to receive texts from both the 8632 and 4727 numbers concerning the date. Eventually, Crommes went up to Fish's room, and Fish was arrested.

Ryan Larson, a detective with the Lakewood Police Department, testified that after completing Fish's arrest, he returned to Moore's vehicle, where other officers were concluding Moore's arrest. Larson called the 4727 number from his phone while standing by Moore's vehicle, and a phone on the driver's seat of Moore's vehicle began to ring. Moore admitted that phone was his. The arresting officers also found a necklace with "Bos$" inscribed on it, hanging from the rear view mirror of Moore's vehicle. RP at 396.

---

[3] "Greek" refers to anal sex. RP at 174-75.

Moore was charged with second degree promoting prostitution and unlawful delivery of a controlled substance. At trial, Moore, Fish, Crommes, Larson, and other individuals testified to establish the facts above. In addition, text messages extracted from the phones associated with the 4727, 5529, and 8632 numbers were admitted into evidence without objection from defense counsel. The State also presented evidence of two separate drug deliveries to support the unlawful delivery charge: one in which Moore was a principal delivering drugs to Fish and another in which Moore was an accomplice aiding Fish to deliver drugs to Crommes.

At the close of evidence and after the jury had begun deliberations, the State proposed a unanimity instruction, which was only related to the unlawful delivery of a controlled substance charge. After hearing arguments from the parties, including an objection by Moore, the trial court allowed the unanimity instruction, which stated:

> The State alleges that the defendant committed acts of Delivery of a Controlled Substance on January 30, 2015, either as a princip[al] or as an accomplice. To convict the defendant of Delivery of a Controlled Substance, one particular act of Delivery of a Controlled Substance must be proved beyond a reasonable doubt, and *you must unanimously agree as to which act has been proved*. You need not unanimously agree that the defendant committed all the acts of Delivery of a Controlled Substance.

Clerk's Papers (CP) at 84 (emphasis added).

The jury found Moore guilty of second degree promoting prostitution, but could not reach a verdict on the unlawful delivery charge. Moore appeals.

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

Moore argues that the text messages related to the 4727 phone number were not properly authenticated and that his counsel was ineffective for failing to object to their admission.[4] We disagree because an objection would not likely have been successful.

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). "The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Therefore, we presume "that the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763. To prove that failure to object rendered counsel ineffective, the petitioner must show that (1) not objecting fell below prevailing professional norms, (2) the proposed objection would likely have been sustained, and (3) the result of the trial would have been different if the evidence had not been admitted. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

---

[4] Moore also directly challenged the admission of this evidence, arguing that the trial court abused its discretion in admitting the evidence. However, as the State correctly points out, Moore's counsel failed to challenge the admissibility of the text message evidence. "[A] party may not raise an objection not properly preserved at trial absent manifest constitutional error." *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009) (citing RAP 2.5). Generally, evidentiary errors are not of constitutional magnitude, *Id.* at 84, and Moore does not allege that the admission of the text message evidence violated his constitutional rights. Thus, we only examine whether he received ineffective assistance of counsel.

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. *State v. Young*, 192 Wn. App. 850, 854, 369 P.3d 205, *review denied*, 185 Wn.2d 1042 (2016) (citing ER 901(a)). To meet this requirement, the party offering the evidence must make a prima facie showing consisting of proof that is sufficient to permit a reasonable fact finder to find in favor of authenticity or identification. *Id.*

The proponent of evidence need not rule out all possibilities inconsistent with authenticity or conclusively prove that evidence is what it purports to be. *Id.* In *Young*, we held that a text message recipient's personal knowledge of the sender's phone number and the contents of the texts was sufficient evidence to permit a reasonable trier of fact to find that the defendant was the sender of the text messages. 192 Wn. App. at 857. The recipient of the text messages in *Young* had personal knowledge of the defendant's phone number because she watched the defendant put it into her phone under an alias. *Id.* In addition, the content of the text messages sent from that same number corroborated the recipient's testimony describing the defendant's conduct. *Id.*

Assuming defense counsel had objected on the grounds of authentication to text messages associated with the 4727 number, it would likely not have been successful. Moore and Fish each testified that he sometimes went by "Boss" or "Bos$." RP at 213, 250, 427. Fish testified that Moore's phone number was the one ending in 4727, which was listed as "Boss" in the contact directory of either the 5529 or 8642 phone. *See* RP at 250-51. After Moore's arrest, Larson called the 4727 number, which made the phone on the driver's seat of Moore's vehicle begin to ring. Larson testified that Moore admitted that the phone that rang was his. During Moore's

6

testimony, he admitted that he used the 4727 number, and that after two recent car accidents, he provided it as his phone number to the police. Like *Young*, a trial court would have likely considered the totality of this evidence as constituting proof sufficient to permit a reasonable fact finder to find in favor of authenticity.

Moore argues, however, that the only evidence linking him to the 4727 number was that he regularly, but not exclusively used that phone. We agree that there is evidence to suggest that Moore may not have been the sender of the text messages, such as his testimony that he let Fish borrow the 4727 phone. However, a trial court "'considers only the evidence offered by the proponent and disregards any contrary evidence offered by the opponent'" in determining whether evidence has been authenticated. *Young*, 192 Wn. App. at 857 (quoting *Rice v. Offshore Sys. Inc.*, 167 Wn. App. 77, 86, 272 P.3d 865 (2012)). In the aggregate, the State's evidence shows that, if defense counsel had objected, a trial court would likely not have excluded the text messages from the 4727 phone.

Accordingly, Moore's ineffective assistance of counsel claim fails.

## II. SUFFICIENCY OF THE EVIDENCE

Moore argues that the State failed to present sufficient evidence that he knowingly advanced or profited from prostitution. We disagree.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any reasonable juror to find the essential elements of the crime beyond a reasonable doubt. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a juror can draw from that evidence. *Id.* All reasonable inferences from the evidence must be drawn in

favor of the State and interpreted strongly against the defendant. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Circumstantial evidence is no less reliable than direct evidence. *State v. Ozuna*, 184 Wn.2d 238, 248, 359 P.3d 739 (2015). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

A person is guilty of second degree promoting prostitution if he knowingly profits from prostitution or advances prostitution. RCW 9A.88.080. Citing *State v. Vasquez*, 178 Wn.2d 1, 13-14, 309 P.3d 318 (2013), Moore argues that the evidence offered to show that he knowingly advanced or profited from prostitution is "patently equivocal" and thus insufficient. Br. of Appellant at 18-19. In *Vasquez*, our Supreme Court held that a defendant's mere possession of forged social security and permanent resident cards was not sufficient evidence to show that he had the intent to injure or defraud to support his forgery conviction. 178 Wn.2d at 13. The evidence in the present appeal, however, is much more unequivocal than that in *Vasquez*. The State presented evidence that Moore paid for Fish's hotel room, protected her during dates, and received cash collected after the dates. Larson testified that, in his training and experience, a pimp exploits prostitutes by keeping the money that they earn. In addition, Moore allowed Fish to use his 4727 phone number, associated with Fish's Backpage.com ads, to set up her dates.

Moore's affirmative acts and association with Fish's prostitution constitute sufficient evidence for a juror to find that Moore knowingly advanced or profited from prostitution. Accordingly, this claim fails.

### III. JURY INSTRUCTION

Moore argues that the trial court erred in giving a unanimity instruction in violation of

CrR 6.15(f)(2) after jury deliberations had begun.[5] We disagree.

CrR 6.15(f)(2) states:

After jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate.

The purpose of CrR 6.15(f)(2) is to prevent judicial interference in the deliberative

process, *State v. Boogaard*, 90 Wn.2d 733, 736, 585 P.2d 789 (1978), by prohibiting a trial court

from suggesting to a jury that it must reach an agreement. *State v. Ford*, 171 Wn.2d 185, 190,

250 P.3d 97 (2011). To preserve unanimity, in *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d

173 (1984), our Supreme Court also held:

When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected. . . . The State may, in its discretion, elect the act upon which it will rely for conviction. *Alternatively, if the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured. When the State chooses not to elect, this jury instruction must be given to ensure the jury's understanding of the unanimity requirement.*

(Emphasis added); *accord State v. Carson*, 184 Wn.2d 207, 217, 357 P.3d 1064 (2015).

Moore was charged with one count of unlawful delivery of a controlled substance, but the

State provided evidence that Moore had participated in two separate drug deliveries: one as a

principal and the other as an accomplice. Thus, consistent with *Petrich*, the State was required to

---

[5] Moore cites to "CR" 6.15(f)(2), which is not a rule. Given his argument and representation, we assume he is referencing CrR 6.15(f)(2).

choose which act it would rely on, or as it did here, ensure that the jury is instructed that they must agree as to which act had been proven before convicting him of the charge.

Moore contends, though, that giving the unanimity instruction after jury deliberations had begun violated CrR 6.15(f)(2). The unanimity instruction states in pertinent part that

> [t]o convict the defendant of Delivery of a Controlled Substance, one particular act of Delivery of a Controlled Substance must be proved beyond a reasonable doubt, *and you must unanimously agree as to which act has been proved.*

CP at 84.

CrR 6.15(f)(2) arose out of concern to prevent coercion of deadlocked juries. *State v. Watkins*, 99 Wn.2d 166, 175, 660 P.2d 1117 (1983). According to the task force recommending it, the rule was intended to "'eliminate the possibility of prejudice attendant upon the giving of an 'Allen' instruction.'" *Watkins*, 99 Wn. 2d at 175 (quoting *Boogaard*, 90 Wn.2d at 737 n.1). The "Allen" instruction, approved in *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), stated:

> [I]f much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.

*Allen*, 164 U.S. at 501; *Watkins*, 99 Wn.2d at 172-73. The *Watkins* court noted that although the United States Supreme Court had never withdrawn its endorsement of the *Allen* instruction, by the mid twentieth century commentators and courts began to perceive *Allen* instructions as being impermissibly coercive. 99 Wn.2d at 173.

The instruction given to Moore's jury after deliberations had begun simply ensured that if the jury convicted, it would do so with required unanimity. The instruction's direction that all 12 jurors "must agree" required that all 12 agree on the same criminal act in order to convict.

10

Nothing in this unanimity instruction pressured or suggested to the jury that it must reach an agreement that an act did or did not occur or that it must reach a verdict within a certain time. *See Ford*, 171 Wn.2d at 190. Its effect, rather, was to guard against a possible decision which, without the instruction, would be presumed prejudicial to the defendant. *See State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007).

For these reasons, giving the unanimity instruction after jury deliberations had already begun did not violate CrR 6.15(f)(2). This claim fails.[6]

## IV. SAG

In his SAG, Moore argues that (1) he was denied his ability to cross-examine his "accuser"; (2) he was unable to view the text message evidence before trial; (3) his defense counsel did not talk to him about strategies and had a conflict of interest; (4) a sitting juror was biased against him; and (5) no probable cause existed to arrest him. SAG at 1.

In regard to claim (1), it is unclear who Moore means by his "accuser," and, therefore, we are unable to analyze this claim. As to claims (2), (3), and (4), the record needs to be supplemented in order for us to review these arguments, which Moore may do in a personal restraint petition. *See State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). As to claim (5), after a CrR 3.6 hearing, the trial court found that probable cause existed to arrest Moore. Moore's bald statement in his SAG, though, does not indicate whether Moore is

---

[6] Moore also argues that he received ineffective assistance of counsel because his counsel did not object to the unanimity instruction. However, defense counsel did initially object, which resulted in the instruction being modified in Moore's favor. Thus, he fails to demonstrate ineffective assistance of counsel.

No. 48814-1-II

challenging the trial court's findings of fact or its conclusions of law, and if so, which specific

ones. Therefore, we do not reach this claim.

For these reasons, Moore's SAG arguments fail.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
BJORGEN, C.J.

We concur:

_____
WORSWICK, J.

_____
JOHANSON, J.