# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57929-4-II |
| Respondent, | |
| v. | |
| LUIS NATANEL REYES, aka LUIS N. MARAVILLA REYES, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Luis Reyes appeals his convictions for (1) delivery of a controlled substance, (2) second degree introduction of contraband, and (3) conspiracy to deliver a controlled substance. Reyes argues that the evidence was insufficient to support a conviction for all three charges, and that the trial court abused its discretion by admitting Reyes' statements on the prison phone calls because they were not adequately authenticated. We hold that sufficient evidence supported Reyes' convictions, and the trial court did not abuse its discretion in admitting the transcripts into evidence. Accordingly, we affirm Reyes' convictions.

FACTS

I. Background Incident

In late November and early December 2021, many inmates at the Olympic Corrections Center (OCC) tested positive for drug use; some required medical attention; and one inmate was

found unresponsive and required Narcan. The severity of the drug problem prompted OCC staff to initiate an investigation into the source of contraband.

During the investigation, an informant notified Department of Corrections (DOC) staff that inmate Luis Reyes was potentially involved in introducing contraband, including controlled substances, into the OCC. The DOC assigned Investigator Brittnee Rooney to monitor Reyes' phone calls, because she is bilingual in English and Spanish, and many of Reyes' calls contained Spanish. Reyes' calls were made using his personal identification number (PIN) and were frequently made to his sister, Patricia Lemus, whose number was on file as his emergency contact. Based on Reyes' calls from November 25, 2021 to December 6, 2021, Rooney determined that at least one delivery of contraband had already occurred in late November 2021, and that another delivery was being planned.

Over the course of multiple calls to Lemus, Reyes instructed her on where, how, and when to deliver the substances and contraband. Reyes used code words like "chocolate," "nighttime," "water," "orange," and "chew" to instruct Lemus on which types of drugs and contraband to include in the delivery. Verbatim Rep. of Proc. (VRP) at 1211-12, 1233-34. "Water" can refer to heroin or methamphetamine, "orange" refers to suboxone, and "chew" refers to chewing tobacco. Clerk's Papers (CP) at 7; VRP at 680-81, 1206, 1218-19. Reyes also specified the quantity of the substances he requested. For example, Reyes directed Lemus to "go by the store and maybe two, three cans of that—of that stuff." VRP at 1211-1212. Reyes later clarified that the "stuff" was "chew" but he did not want to discuss that on the phone. *Id.* Reyes also instructed Lemus on how to deliver the contraband into the prison. Reyes told Lemus where along the perimeter of the prison fence line to throw the package—near a greenhouse, and he told her how to conceal the package

2

by painting it to blend in with the ground. Reyes' phone conversations also indicated that Reyes coordinated with another unknown inmate who "works in the morning" and would retrieve the drugs where they landed. *Id.* at 1211. And Reyes discussed logistical issues related to drug prices, reimbursement, and travel to the OCC with Lemus.

Reyes' conversations with Lemus indicated that at least one successful delivery had occurred. Reyes told Lemus that "everything was good" and that he would send her the money today. *Id.* at 1198. Reyes also prompted future deliveries saying that "the same thing can be done. . . . [t]he same way each time" and offered suggestions for how to improve future deliveries. *Id.* at 1198-99. For example, Reyes told Lemus to "Tell him that when he goes, not to go round and round so much" and to wait a little while and then come back to where Lemus would be hiding on the side of the road where no one could see her. *Id.* at 1199.

Then on December 14, 2021, Reyes told his brother, Fernando Reyes,[1] to "[d]o it tonight" or "tomorrow," and explained that someone else would show him "exactly where she did it" the previous time. *Id.* at 1249. After this call, OCC staff moved Reyes out of the Hoh Unit of the prison where he had been living into segregation in a separate unit, the Ozette Unit, while DOC and local law enforcement waited for the delivery to occur.

On the morning of December 16, 2021, OCC staff observed a gold Cadillac idling in a ditch in the vicinity of the prison. Reyes' phone calls to Lemus indicated that she may drive a Cadillac ("[T]he Cadillac is yours now." *Id.* at 1201.), so the gold Cadillac got the attention of an OCC staff member. The OCC staff member approached the car and found the driver, Dongelique Spillers, slumped over in the running vehicle. The vehicle was registered to Lemus. Shortly after

---

[1] Because Fernando shares a surname with the appellant, we refer to him by his first name.

3

the vehicle was discovered, Fernando emerged from the woods near the OCC and was taken into custody by officers.

After finding the gold Cadillac, OCC staff initiated a lockdown during which inmates were allowed to use the common bathroom. OCC staff then transferred the inmates to another facility. During the evacuation, OCC staff checked each bathroom to ensure they were clear of inmates. Staff discovered a plastic bag containing suboxone strips, tobacco, heroin, and methamphetamine in a toilet in the common bathroom. Prison staff conduct hourly walkaround searches of the facilities, including the bathrooms. Staff did not find drugs in the toilet during the previous walkaround.

OCC staff testified that it was unusual to find that quantity and variety of drugs in the facility. Suboxone typically comes in strips which are cut up into tenths before being sold. The suboxone strips found in the Hoh Unit bathroom and had not been cut into tenths.

As part of the investigation, investigators executed a warrant to search Reyes' CashApp account. Several payments between $200 and $500 were sent to Reyes' account between November and mid-December 2021. One of the payments had a message stating "for Bishop." *Id.* at 1046. Bishop was one of the inmates who was found to be under the influence of drugs in late November 2021.

Finally, Lemus' phone records showed movement of her phone consistent with having travelled to the OCC on November 21, and 26-27, 2021. These dates roughly correspond with the dates that investigators believed the previous drug deliveries into the OCC took place, based on Reyes' phone calls with Lemus.

The State charged Reyes with delivery of a controlled substance and second degree introduction of contraband on the theory that Reyes was an accomplice to his siblings. The State also charged Reyes with conspiracy to deliver a controlled substance. The case proceeded to a jury trial.

## II. Trial

At trial, the State's witnesses testified consistently with the above facts.

As the basis of its case, the State sought to admit certified translated transcripts of recorded prison phone calls attributed to Reyes pertaining to the alleged drug deliveries. Prior to trial, Reyes objected to admission of the phone call recordings and transcripts arguing that it was impossible for the State to authenticate them where there was no identified speaker or date. The court reserved the issue for trial.

The parties discussed the admissibility of the phone call recordings and transcripts outside of the presence of the jury. During the hearing, Rooney testified that she accessed the calls for Luis Reyes using his unique DOC identification number. Rooney was asked to target calls made to Lemus' phone number because that number was associated with conversations related to the introduction of drugs into the facility. Rooney knew the number belonged to Lemus because Lemus was listed as Reyes' emergency contact using that number. Each call that is pulled by an investigator has a file number which includes the date and time that the call was made as well as the phone number the call was made to. The conversations were in both English and Spanish. All but two of the conversations were between a man and a woman. In the conversations between two men, both men referred to the same person as their sister. After reviewing the phone calls, Rooney

interviewed Reyes. During the brief interview, Rooney recognized Reyes' voice as the voice in the phone calls.

Based on this information, the trial court ruled that while the State authenticated the calls as to Reyes, the court could not admit the phone calls in their entirety because the State had not established who Reyes was talking to in the calls. Reyes' statements from the phone calls were read into the record. At the close of trial, Reyes moved to dismiss the charges, arguing that the State presented insufficient evidence of delivery of drugs or conspiracy to deliver drugs. After hearing argument on the matter, the court denied the motion.

The jury convicted Reyes on all three charges. After the verdict, Reyes moved for a new trial, citing improper admission of the phone call transcripts into evidence on the grounds that they were not properly authenticated. The trial court determined that "[t]here was no prejudice to the defendant" and denied the motion. *Id.* at 1427. Reyes was sentenced to a total confinement of 90 months with 12 months on community custody.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

We hold that the evidence was sufficient to find Reyes guilty beyond a reasonable doubt on all counts. Reyes orchestrated the delivery of controlled substances into the OCC through coordinated efforts with Lemus, Fernando, and an unknown inmate, satisfying the elements of delivery of controlled substances, second degree introduction of contraband, and conspiracy to deliver controlled substances.

A. Legal Principles

Whether evidence is sufficient to support a conviction is a constitutional question that we review de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The test for sufficiency of the evidence is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (emphasis omitted) (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)). We assume that the State's evidence is truthful, and we deem both direct and circumstantial evidence to be equally reliable. *State v. Ozuna*, 184 Wn.2d 238, 248, 359 P.3d 739 (2015).

B. Delivery of a Controlled Substance and Introduction of Contraband

*i. Legal Principles*

To convict on delivery of a controlled substance, the State must prove beyond a reasonable doubt that the defendant knowingly delivered a controlled substance. *State v. Evans*, 80 Wn. App. 806, 814, 911 P.2d 1344 (1996); RCW 69.50.401.[2] Delivery is the actual or constructive transfer from one person to another of a substance. Former RCW 69.50.101(i) (2020). Constructive delivery is " 'the transfer of a controlled substance either belonging to the defendant or under his direct or indirect control, by some other person or manner at the instance or direction of the defendant.' " *State v. Campbell*, 59 Wn. App. 61, 63, 795 P.2d 750 (1990) (quoting *Davila v. State*, 664 S.W.2d 722, 724 (Tex. Cr. App. 1984) (interpreting a parallel provision of Texas code that is also derived from the Uniform Controlled Substances Act)).

---

[2] RCW 69.50.401 was amended in 2022. Because this amendment does not impact our analysis, we cite to the current version of the statute. *See* LAWS OF 2022, ch. 16, § 84.

To convict on second degree introduction of contraband, the State must prove that the defendant "knowingly and unlawfully provide[d] contraband to any person confined in a detention facility or secure facility under chapter 71.09 RCW with the intent that such contraband be of assistance in an escape or in the commission of a crime." RCW 9A.76.150(1). It is a crime for any person serving a sentence in any state correctional institution to knowingly possess or carry any narcotic drug or controlled substance while in the institution. RCW 9.94.041.[3]

A person is guilty of a crime committed by the conduct of another person with which he is an accomplice. RCW 9A.08.020(1), (2)(c). A person is an accomplice of another if he or she "[s]olicits, commands, encourages, or requests" the other person to commit the crime or "[a]ids or agrees to aid such other person in planning or committing it" and they know that these actions will promote of facilitate the commission of this crime. RCW 9A.08.020(3).

*ii. Application*

Reyes argues that the evidence failed to prove that Reyes constructively delivered drugs because there was no evidence that Reyes owned or controlled the drugs found in the Hoh Unit bathroom. But Reyes' convictions were predicated on a theory of accomplice liability. Thus, Reyes could be convicted so long as he requested that someone else deliver drugs into the prison or aided them in planning to deliver or delivering drugs knowing that this action would facilitate the delivery. RCW 9A.08.020(3). Here, sufficient evidence proved that Reyes aided Fernando and Lemus in delivering drugs and contraband to the prison.

---

[3] RCW 9.94.041 was amended in 2022. Because this amendment does not impact our analysis, we cite to the current version of the statute. *See* LAWS OF 2022, ch. 16, § 3.

The evidence permitted a reasonable trier of fact to find that, at Reyes' direction, Fernando delivered the drugs and contraband found in the Hoh unit bathroom. Over many phone conversations, Reyes asked Lemus, in code, to deliver drugs to the prison. Reyes also helped Lemus plan the delivery by telling her which types of drugs to include in the delivery and what quantity. Reyes also instructed Lemus on how to deliver the contraband into the prison. Reyes told Lemus where along the perimeter of the prison fence line to throw the package and how to conceal the package by painting it to blend in with the ground. Reyes also referred to another unknown inmate who would retrieve the packages of drugs from where they were thrown over the fence. Reyes' conversations indicated that Reyes and Lemus had been involved in at least one successful delivery prior to December 16. Reyes told Lemus that "everything was good" and that he would send her the money today. VRP at 1198. Reyes also said that "the same thing can be done. . . . [t]he same way each time" and offered suggestions for how to improve future deliveries. *Id.* The facts that Lemus' cell phone location data showed movement consistent with having travelled to the OCC on dates corresponding with the suspected drug deliveries and that Reyes received significant CashApp payments during the time period in question support the conclusion that successful deliveries occurred.

Fernando became involved in this scheme during a phone conversation in which Reyes told him to "[d]o it tonight" or "tomorrow" and explained that someone else would show him "exactly where she did it" the previous time. *Id.* at 1249. Less than two days later, OCC staff found Fernando, who was not on the approved visitors list, in the woods outside the prison walking to Lemus' vehicle. Hours later, as the Hoh unit was being evacuated, drugs of the type that Reyes requested were found in the communal bathroom. This evidence is sufficient to prove that, at

Reyes' request, Fernando delivered drugs to an unknown inmate in the manner that Reyes and Lemus had tested during previous deliveries.

Reyes argues that, even assuming that Fernando threw drugs over the fence, there is no evidence that the drugs were delivered to someone within the prison. But the evidence supports the existence of an unknown third person who retrieved the drugs. In Reyes' conversations with Lemus he references another inmate who "works in the morning" and would find the drugs. *Id.* at 1211. Moreover, the fact that the drugs were promptly found and moved to the Hoh Unit bathroom, although Reyes was in segregation, supports the existence of another, unknown inmate involved in the delivery.

Reyes contends that the drugs found in the Hoh unit bathroom could have been delivered by a different drug operation. But we must draw all reasonable inferences in favor of the State. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Here, the evidence supports the reasonable inference that the drugs had been recently delivered to the prison. During the hourly walkaround searches, prison staff found no contraband in the bathrooms. And, when prison staff found the drugs in the toilet, the suboxone strips were still intact and the other drugs had not yet been parceled out for distribution. A reasonable trier of fact could find that the drugs and contraband found in the Hoh Unit bathroom were delivered by Fernando at Reyes' direction.

C. Conspiracy

*i. Legal Principles*

A conviction of a criminal conspiracy requires an agreement between two or more persons to commit the crime, as well as a substantial step taken in pursuance of the agreement by any one of them. *State v. Williams*, 131 Wn. App. 488, 496, 128 P.3d 98 (2006); RCW 9A.28.040(1). For

conspiracy to deliver a controlled substance, at least three persons must be involved because delivery itself requires two parties. *State v. McCarty*, 140 Wn.2d 420, 426, 998 P.2d 296 (2000). "An agreement can be shown by a 'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.' " *State v. Smith*, 65 Wn. App. 468, 471, 828 P.2d 654 (1992) (internal quotation marks omitted) (quoting *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987)). Preparation can be a substantial step where it furthers the ability of the conspirators to carry out the agreement. *State v. Dent*, 123 Wn.2d 467, 477, 869 P.2d 392 (1994).

*ii. Application*

Reyes argues that the evidence was insufficient to prove that Reyes agreed with three or more people to deliver contraband. Reyes specifically contends that no conspiracy could exist because there was no evidence that Fernando agreed to deliver controlled substances nor that he took a substantial step in furtherance of the agreement because there was no direct evidence that Fernando possessed drugs. We disagree.

Sufficient evidence proved that Reyes, Fernando, Lemus, and an unknown inmate inside the OCC agreed to deliver drugs and contraband into the prison. Over the phone, Reyes requested that Lemus and Fernando deliver drugs to the prison. Reyes also explained that another inmate would retrieve the drugs after they had been thrown over the fence. While planning future deliveries with Fernando and Lemus, Reyes indicated that previous deliveries had been successfully accomplished.

Reyes contends that there was no evidence that Fernando took a substantial step because there was no direct evidence that Fernando ever possessed drugs. But a conspiracy is established

11

at the time that *any* conspirator takes a substantial step *in pursuance of the agreement*, not a substantial step toward the commission of the crime. RCW 9A.28.040(1). Thus, a telephone conversation planning the crime is a substantial step for conspiracy. See *Dent*, 123 Wn.2d at 477. Here, the evidence established that Lemus, Fernando, and Reyes planned to deliver controlled substances over multiple phone calls.

Moreover, sufficient evidence established the existence of an agreement and a substantial step taken in furtherance of that agreement because, as discussed above, the evidence supported a finding that Fernando actually delivered the drugs that were found in the Hoh Unit bathroom. Accordingly, the evidence is sufficient to sustain Reyes' conspiracy to deliver a controlled substance conviction.

## II. ADMISSIBILITY OF THE PHONE CALLS

We hold that the trial court did not abuse its discretion when it admitted Reyes' statements from the prison phone calls, as Reyes' participation in the phone call was properly authenticated through PIN usage, voice identification, and corroborating contextual details.

A. Legal Principles

We review the trial court's decision on the authenticity of evidence for an abuse of discretion. *State v. Williams*, 136 Wn. App. 486, 499, 150 P.3d 111 (2007). "A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons." *Id.*

Authentication of evidence under ER 901 " 'merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.' " *State v. Payne*, 117 Wn. App. 99, 106, 69 P.3d 889 (2003) (quoting *United States v. Jimenez Lopez*,

873 F.2d 769, 772 (5th Cir. 1989)). The proponent " 'need not rule out all possibilities inconsistent with authenticity or conclusively prove that evidence is what it purports to be; rather, the proponent must provide proof sufficient for a reasonable juror to find the evidence is what it purports to be.' " *State v. Andrews*, 172 Wn. App. 703, 708, 293 P.3d 1203 (2013) (quoting *State v. Thompson*, 777 N.W.2d 617, 624 (2010)).

B. Application

Reyes argues that the trial court abused its discretion by admitting Reyes' statements from the prison phone calls because Reyes' participation in the calls was not properly authenticated. We disagree.

First, Reyes contends that Rooney's brief contact with Reyes was insufficient to reliably identify his voice. However, Rooney was familiar with the voice in the calls after listening to more than 20 calls multiple times, and she verified that Reyes' voice matched the voice in the calls during an in-person interview.

Next, Reyes contends that, because inmates can share PINs, the calls made using his PIN might not have been made by him, and no witnesses with personal knowledge of the calls testified about their authenticity. But the State is not required to rule out all possibilities inconsistent with admissibility. *Id.* Here, the circumstances surrounding the calls support a finding that Reyes was using his own PIN. The calls were made to his sister, Lemus (who was his emergency contact) and all but two of the conversations were between a man and a woman. On one occasion where a man answered the phone, both the caller and the recipient referred to the same person as their sister, indicating that the call was between Reyes and his brother, Fernando. The calls were made in both English and Spanish, the languages in which Reyes is fluent. And Rooney confirmed that the

callers' voice matched Reyes' voice during her conversation with him. This evidence supports the conclusion that Reyes was the speaker in the recordings. Accordingly, the trial court did not abuse its discretion.

## CONCLUSION

The State presented sufficient evidence for a rational trier of fact to find Reyes guilty beyond a reasonable doubt of delivery of controlled substances, second degree introduction of contraband, and conspiracy to deliver controlled substances. The evidence demonstrated that Reyes coordinated with Lemus, Fernando, and an unknown inmate to deliver drugs and contraband into the OCC. And the trial court acted within its discretion in admitting Reyes' statements from the prison phone calls because the evidence established that the statements were attributable to Reyes. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

MAXA, J.

PRICE, J.