[No. 48770-7. En Banc. March 17, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. DONALD FRANK WATKINS, *Petitioner.*

*Peter Offenbecher* of *Seattle–King County Public Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *William H. Redkey, Deputy,* for respondent.

PEARSON, J.—Defendant Donald Frank Watkins appeals a decision of the Court of Appeals affirming his conviction of one count of second degree assault.

This appeal presents a single issue: Did the trial court improperly coerce a verdict by giving a supplemental instruction after the jury informed the court it was deadlocked? We hold, after considering all the circumstances of this case, that the supplemental instruction was not improperly coercive. The instruction was merely a restatement of prior instructions to clarify an obvious ambiguity, and did not suggest to the jury the decision it ought to reach.

On June 5, 1978, defendant was charged with three counts of assault in the first degree. In his first trial, defendant was convicted by a jury on count 1 and acquitted on counts 2 and 3. The Court of Appeals reversed defendant's conviction on count 1 on the grounds that he had been denied his right to represent himself. The case was remanded for retrial. *See State v. Watkins*, 25 Wn. App. 358, 606 P.2d 1237 (1980). On remand, the court dismissed counts 2 and 3. At the trial on the remaining charge of first degree assault, defendant appeared pro se (assisted by a court appointed legal advisor). The trial took place between September 2 and 5, 1980.

The State alleged that defendant fired several shots into an elevator which contained an employee of the hotel at which defendant lived. This employee was the State's principal witness. He testified that he was at the time of the incident an employee of the Seattle Housing Authority, working as a shelter monitor at the Morrison Hotel. On March 25, 1978, defendant complained to the witness that he was not receiving his mail. The witness informed defendant that his responsibilities did not include dealing with mail, but defendant persisted with his complaints. The witness asked defendant to leave him alone, whereupon defendant became agitated. After a heated discussion, defendant threw down the umbrella he carried and the witness observed him reach for something. The witness ran to

a nearby elevator, which had three other people in it, and pulled the door closed. As he did so, he heard an explosion and a blast came through the door, showering the occupants with glass fragments.

This account was substantially corroborated by another witness, one of the other occupants of the elevator at the time of the incident. Police witnesses testified that three bullet holes were found in the elevator door and one in the ceiling a few feet from the elevator. Two "lead deposits" (discharged slugs) were found in the elevator car in a search shortly after the incident. An officer called to the Morrison Hotel to investigate the shooting discovered defendant in a first floor hallway of the hotel, lying face down on the floor with a revolver 2 feet from his right foot. The officer testified that, after being advised of his rights, defendant explained that he had argued with the hotel employee, fired one shot into the ceiling, and "a few rounds" into the elevator, and then, hearing the police arrive, had lain on the floor to await them.

Defendant's account of the events may be summarized as follows. The State's principal witness (the employee) was of a violent disposition and regularly beat up residents of the Morrison Hotel. When defendant requested his assistance in securing delivery of his mail, the employee demanded half of the money defendant expected to receive in the mail. The employee had been drinking. After the heated exchange about the delivery of defendant's mail, the employee and another man came at defendant. The employee was armed with a 2–foot–long saber, the other man with a long knife. Fearing that the employee might have a gun, defendant drew his pistol and fired three shots into the floor. The employee backed off on the third shot, but did not drop his saber. Defendant allowed his attackers to go down in the elevator, whereupon he called the police. He told the police officer who answered the call that he would lie in the hall and wait for the police; he said, "There will be a gun about 3 feet from my right leg and I will be down in the north end on the first floor". He was lying thus

when the officer found him.

In a brief cross examination, defendant said that he had caused the three bullet holes in the door of the elevator. Following presentation of the evidence, the jury was instructed on assault in the first degree and on the lesser included offense of assault in the second degree. The only affirmative defense on which the jury was instructed was self–defense. The jury was also instructed with WPIC 155.00, which included the following paragraph:

> If you find the defendant guilty of the crime of assault but have a reasonable doubt as to which of two or more degrees of that crime the defendant is guilty, it is your duty to find the defendant not guilty on verdict form A and to find the defendant guilty of the lower degree on verdict form B.

Verdict form A read as follows:

> We, the jury, find the defendant Donald Frank Watkins _____ of the crime of Assault in the First Degree as charged.

Verdict form B read as follows:

> We, the jury, find the defendant Donald Frank Watkins not guilty of the crime of Assault in the first degree as charged and find the defendant _____ of the crime of Assault in the second degree.

The case was submitted to the jury on Friday, September 5, 1980, at 11:53 a.m. At 3:05 p.m. the jury submitted a written inquiry to the court: "Can anyone show where the bullets hit the back of the elevator?" The court responded with a written message: "You must decide the case on the evidence you have heard". At 5 p.m., the jury sent a second written message to the court:

> We have reached a deadlock. Is there any chance of adjourning until Monday? Some people have urgent business over the weekend. What is the normal procedure in this instance?

Through the bailiff, the court requested the jury to continue deliberations. At 6:18 p.m., the jury submitted another written message: "We *must* be deadlocked. We're not even talking."

At 6:30 p.m., Watkins' legal advisor, the prosecutor, and the court agreed to submit two new verdict forms to the jury. The first of these, form C, read:

We, the jury, find the defendant _____ of the crime of assault in the first degree.

The second, form D, read:

We, the jury, find the defendant _____ of the crime of assault in the second degree.

The trial court also proposed to submit to the jury the following supplemental instruction:

You are now being given verdict forms C and D. If the jury can agree upon the question of guilt or innocence as to either assault in the First Degree or assault in the Second Degree, fill in the appropriate verdict form to express that verdict. In this process it is not necessary that you agree on assault in the First Degree before considering assault in the Second Degree. Do not use verdict forms A and B, but only verdict forms C and/or D.

Watkins objected to the court's proposed supplemental instruction. The objection was noted, but the two new verdict forms and the supplemental instruction were given to the jury at 6:45 p.m. At 6:55 p.m., the jury announced its finding that Watkins was guilty of assault in the second degree. The jury was polled and responded that its verdict was unanimous.

Division One of the Court of Appeals affirmed in an opinion filed April 5, 1982. *State v. Watkins,* 31 Wn. App. 485, 643 P.2d 465 (1982). The court held that the supplemental instruction correctly stated the law and that the trial court had not coerced the jury into reaching its verdict.

 The problem presented by this case is not new. Courts for centuries have been required to determine what, if any, judicial intervention is permissible when a jury declares itself deadlocked or otherwise appears unable to reach a verdict. Such a determination requires the balancing of two competing interests. On the one hand is the recognition of the burden which would be imposed upon the

judicial system by requiring a retrial in every case of deadlock. On the other hand is the compelling interest of a defendant to have his guilt or innocence determined by a jury which is impartial and free of coercion from the trial court. No simple formula has emerged over the years for achieving an equilibrium between these conflicting interests. The problem remains a difficult and delicate one.

Several centuries ago there was little judicial reticence in using strong measures to secure a verdict from a jury.

> In the early days direct and forceful action was the guiding light. Load the jurors onto oxcarts and have them bounce around until a verdict was reached, or perhaps keep the jurors without food or drink until a verdict came forth. Such drastic steps soon became unpopular, yet direct action was still taken by trial judges. Some ordered that food rations to deadlocked jurors be cut back or that the jurors be forced to pay for their own food. Other judges preferred somewhat different methods such as not providing heat to the jury room during the middle of winter, or simply requiring the jury to deliberate all night without offering the jurors the option of getting some sleep. One trial judge took perhaps the most direct action of all; he informed the jurors that if he found any juror to have "stubbornly refused to do his duty" he would send that juror to jail for contempt of court.

(Footnotes omitted.) Marcus, *The Allen Instruction in Criminal Cases: Is the Dynamite Charge About To Be Permanently Defused?*, 43 Mo. L. Rev. 613, 614 (1978).

In the nineteenth century, appellate judges found such practices too forceful and more subtle means of encouraging verdicts were developed. The most successful was the supplemental instruction to the deadlocked jury to reconsider and perhaps come up with a unanimous verdict. The use of such instructions was approved by the United States Supreme Court in *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896). In that case, the Court approved a supplemental instruction given to a deadlocked jury that "if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a

reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself". 164 U.S. at 501. Such instructions proved so effective in removing deadlocks that they came to be used as a matter of course in most jurisdictions.

The United States Supreme Court has never withdrawn its endorsement of the *Allen* instruction. Nevertheless, 50 years after *Allen* was decided, commentators and courts began to perceive *Allen* instructions as being impermissibly coercive. This court, for example, in *State v. Ring,* 52 Wn.2d 423, 325 P.2d 730 (1958) disapproved an instruction, given before the jury retired, which informed each juror that he might "without a violation of his oath, consent to a verdict which he would not alone render". 52 Wn.2d at 427. Although this instruction was taken almost verbatim from one approved in an earlier case, this court held that it might persuade minority jurors to "compromise with their consciences and yield to the majority for the mere purpose of agreement". 52 Wn.2d at 428. This court again demonstrated its sensitivity to the potential coercive effect of an *Allen* instruction in *Iverson v. Pacific Am. Fisheries,* 73 Wn.2d 973, 442 P.2d 243 (1968). There a supplemental instruction was given to a jury when it informed the court it was deadlocked at 9 to 3.

> "Any verdict you reach must be agreed upon by ten jurors. In your deliberations you should examine the questions submitted with a proper regard and consideration for the opinions of each other. You should listen to each other's arguments with an open mind, and give due consideration to the opinions of your fellow jurors without surrendering your own convictions for the law contemplates that by your discussion you should harmonize your views if possible and thereby arrive at a verdict. On the other hand, the law does not contemplate that you compromise with your consciences nor yield your views for the mere purpose of agreement. You should make every reasonable effort to reach a verdict.
>
> "Again let me remind you that you should not single out any instruction or part thereof, including this one, and place undue emphasis upon it. In your deliberations

continue to consider the instructions as a whole."

73 Wn.2d at 974 n.2. The jury returned a verdict (11 to 1) within 10 minutes of resuming deliberations. Although the instruction was a pattern jury instruction designed precisely for such circumstances, this court held that it entitled the losing party to a retrial.

> This, however, is not a criticism of the instruction, but a recognition of its probable coercive effect when the jurors knew that the trial court had been advised how they stood on the merits of the case.

73 Wn.2d at 975–76. The court concluded that the brief deliberation combined with the jurors' knowledge that the court had been informed they stood 9 to 3 was "almost conclusive evidence" that two jurors had been pressured into a change of position.

Members of the American Bar Association Task Force on Criminal Justice shared this concern that *Allen* instructions could coerce minority jurors into abandoning their honestly held convictions and voting with the majority. In 1968 the task force proposed a carefully worded instruction to be given to assist a jury in reaching a verdict. Standard 5.4 provides as follows:

> (a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:
> (i) that in order to return a verdict, each juror must agree thereto;
> (ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
> (iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;
> (iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and
> (v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

*ABA Standards Relating to the Administration of Criminal Justice,* Std. 5.4, at 332 (Comp. 1974).

This proposal was widely adopted by both federal and state courts.[1]

██ In this state, concern for preventing coercion of a deadlocked jury led to the adoption in 1973 of CrR 6.15(f)(2). This rule prohibits the giving of certain instructions to a deadlocked jury.

After jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate.

The task force recommending this rule intended by it to "eliminate the possibility of prejudice attendant upon the giving of an 'Allen' instruction." *State v. Boogaard,* 90 Wn.2d 733, 737 n.1, 585 P.2d 789 (1978).

The Washington Pattern Jury Instructions suggest that this rule prohibits any instruction being given to a deadlocked jury. *See* WPIC 4.81 and comment thereto. We do not interpret the rule this broadly. The clear language of CrR 6.15(f)(2) prohibits instructions which suggest any of three specific things: the need for agreement, the consequences of no agreement, and the length of time the jury will be required to deliberate. It does not prohibit all instructions.

The supplemental instruction given by the trial court in

---

[1]An instruction similar to the ABA recommendation is set forth in WPIC 1.04, which recommends that the instruction be given in every case before the jury retires. It does not appear to have been given to the jury in the present case.

this case violates none of the prohibitions of CrR 6.15(f)(2). The instruction did not suggest that the jury had to reach an agreement and it did not suggest to the jury the consequences of its failing to arrive at a verdict. *Cf. United States v. Harris,* 391 F.2d 348, 354 (6th Cir. 1968). The instruction did not suggest the length of time for which the jury had to deliberate. *Cf. Burroughs v. United States,* 365 F.2d 431, 434 (10th Cir. 1966). Rather, the supplemental instruction restated instructions given when the jury retired in an apparent attempt to clarify those instructions and the verdict forms. This instruction did not violate CrR 6.15(f)(2), and is also not inconsistent with ABA Standard 5.4(b).

▮ CrR 6.15(f)(2), however, is not the only criterion by which the supplemental instruction must be measured. We recently applied the broader principle that the jury must be free from judicial pressure in reaching its verdict. *State v. Boogaard, supra.* In that case we recognized that "the right of jury trial embodies the right to have each juror reach his verdict uninfluenced by factors outside the evidence, the court's proper instructions, and the arguments of counsel". 90 Wn.2d at 736. We turn now to consider whether the supplemental instruction violated this right.

An appropriate starting point is the opinion in *Boogaard.* The jury in that case began its deliberations in midafternoon. When no verdict had been reached by 9:30 p.m., the court through its bailiff ascertained that the vote stood at 10 to 2 (but did not inquire in whose favor). The jury was called into the courtroom and polled as to the likelihood of reaching a verdict within 30 minutes. All except one juror opined that a verdict could be reached in that time. After 30 minutes' further deliberation, a guilty verdict was reached. This court held that polling the jurors as to their ability to reach a verdict was improperly coercive. We said:

> The questioning of individual jurors, with respect to each juror's opinion regarding the jury's ability to reach a verdict in a prescribed length of time, after the court was apprised of the history of the vote in the presence of the

jurors, unavoidably tended to suggest to minority jurors that they should "give in" for the sake of that goal which the judge obviously deemed desirable—namely, a verdict within a half hour.

90 Wn.2d at 736. The focus of an inquiry in *Boogaard* was whether the court's intervention "tended to and most probably did influence the minority jurors to vote with the majority". 90 Wn.2d at 740. In making this inquiry, we considered all the circumstances of the trial court's intervention during the jury's deliberations. We now make a similar inquiry in the present case.

Defendant argues that the supplemental instruction in this case in fact tended to influence the jury. He argues that the supplemental instruction in effect indicated to the deadlocked jury that a verdict of assault in the second degree would be reasonable. Defendant suggests that the jurors had indicated to the court that they did not want to deliberate any further, that they wanted to go home for the weekend, and that the supplemental instruction offered them a way to go home: by reaching agreement on assault in the second degree. Indeed, defendant argues, this was the only way in which the jurors (to their knowledge) would be allowed to go home for the weekend. Finally, defendant points to the fact that the jurors took only a few minutes to reach a verdict after receiving the supplemental instruction. He argues that this is strong evidence that the jury's deliberations were actually influenced by the supplemental instruction.

If defendant were required merely to show that the trial court's intervention had any tendency, no matter how remote or speculative, to influence the jury, then he probably should prevail here. But we think that a defendant must show more than a mere tendency to influence the jury. In *Boogaard* we required more than a mere tendency to improperly influence the jury; we based our decision on the probability that minority jurors actually were persuaded to change their votes. We conclude therefore that a defendant must provide more than mere speculation about

how the trial court's intervention might have influenced the jury's verdict. Rather, a defendant must establish a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention.

In this case we conclude that defendant has failed to establish such a possibility. The supplemental instruction is a carefully neutral explanation of the earlier instructions clarifying an ambiguity present in verdict form B. The judge might well have been alerted to the need for clarification of the verdict form by the jury's question to the court at 3:05 p.m. This question might well have suggested to the judge that the jury was at that time considering the degree of assault. According to the jury's instruction, the principal fact which distinguished first degree assault from second degree assault was defendant's intent to kill the victim. The location of the bullet holes in the elevator could certainly be considered relevant to the intent of defendant in firing into the elevator. When the jury later declared itself deadlocked, the judge might quite reasonably have concluded that the deadlock was due to disagreement as to the degree of assault. Verdict form B is clearly susceptible to the interpretation that the jury must agree on a verdict of not guilty of first degree assault before considering second degree assault. The supplemental instruction merely informs the jurors that this was not the intended meaning of the verdict form.

We find nothing in the instruction itself or the circumstances of its being given to establish a reasonable possibility that jurors were persuaded by it to abandon conscientiously held opinions in favor of defendant. If any jurors were persuaded to abandon their opinions, it almost certainly would be those who believed defendant was guilty of first degree assault.

Defendant's hypothesis, on the other hand, is that the instruction could have persuaded jurors who had previously voted to acquit defendant to change their votes to convict him of second degree assault. In our opinion this possibility is too remote to establish improper coercion. It is unlikely

in the extreme considering the evidence presented that jurors who had resolutely clung to their opinions for several hours, necessitating two pleas to the court claiming deadlock, would abandon those opinions within a few minutes of receiving this instruction. We conclude, therefore, that the supplemental instruction did not impermissibly coerce the jury into reaching a verdict.

Defendant makes two other arguments which may be disposed of quite briefly. First, he argues that CrR 6.15(f)(1) precludes a judge's giving supplemental instructions unless requested by the jury. Defendant misreads the rule. It merely provides for the procedures to be followed in giving such instructions pursuant to a jury's request; it does not prohibit sua sponte supplemental instructions.

Defendant also urges us to adopt the approach of the Indiana Supreme Court which prohibits any additional instruction of the jury after deliberations have begun. *See, e.g., Jenkins v. State,* ___ Ind. ___, 424 N.E.2d 1002 (1981). We decline the invitation. Such an approach is inconsistent with our court rules which clearly contemplate supplemental instructions in appropriate circumstances. CrR 6.15(f).

The Court of Appeals is affirmed.

WILLIAMS, C.J., and ROSELLINI, STAFFORD, UTTER, BRACHTENBACH, DOLLIVER, DORE, and DIMMICK, JJ., concur.