**FILED**
**SEPTEMBER 25, 2025**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  39905-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSE AGUSTIN SANCHEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Jose Sanchez appeals his conviction for attempting to elude a police vehicle, raising four primary arguments: (1) his right to a fair trial was violated when he was shackled during a pretrial hearing without the trial court conducting an individualized inquiry into the necessity of restraints, (2) the trial court abused its discretion by denying a continuance request to secure a missing witness, (3) the trial court's response to a jury question improperly coerced a guilty verdict, and (4) appellate costs should not be imposed because the trial court found him indigent.  Sanchez also filed a statement of additional grounds for review (SAG) raising three additional issues.

We find no error and affirm.

BACKGROUND

In the early morning hours of April 14, 2021, Officer Jordan McNulty with the

Colville Tribal Police Department observed a black Toyota Sequoia, known to be

registered to Jose Sanchez, traveling at a high rate of speed.  Officer McNulty, who had

known Sanchez for over a decade, pursued the Sequoia after receiving information from

dispatch about an incident involving Sanchez.  During the pursuit, the Sequoia stopped in

front of a residence, where Officer McNulty exited her vehicle, drew her gun, and

attempted to perform a felony stop after identifying Sanchez as the driver.  Sanchez then

put his head out the window, looked at Officer McNulty and said, "fuck you, Jordan.

You told my mom that I had a bunch of dope on me."  Rep. of Proc. (RP) at 546.

During this interaction, a person Officer McNulty knew to be Josh Romero[1]

emerged from the residence.  Romero then approached the driver's side window of the

Sequoia, and Officer McNulty told him to move away.  In her written report, Officer

McNulty noted that she heard Romero say that Sanchez was driving the vehicle.

Despite Officer McNulty's commands, Sanchez drove off, leading to a high-speed

chase during which the Sequoia crashed through a fence and became temporarily

immobilized.  Sanchez managed to free the vehicle and escape, leaving behind a taillight

---

[1] The trial transcript spells Romero's name as "Ramiro" in places.  Both parties
refer to him as "Romero," so this opinion uses that spelling.

assembly at the scene, but not before Officer McNulty again observed Sanchez behind the wheel.  Sanchez was not apprehended that night.

*Procedure*

On May 30, 2023, the State charged Sanchez with attempting to elude a police vehicle.[2]

Trial on the matter was continued numerous times over the next two years for various reasons.  At the readiness hearing on May 23, 2023, defense counsel requested a continuance to secure the testimony of Romero.  Defense counsel argued that he was unable to contact Romero and pointed out that he was on the State's witness list and that he had an active warrant from district court.  The prosecutor stated that she had been in contact with Romero, who indicated he would appear and was cooperative, and that she could potentially arrange an interview for defense counsel within the week.  The prosecutor explained that she anticipated Romero would testify that he confirmed to Officer McNulty at the scene that Sanchez was driving the Sequoia, then added that defense counsel wanted to interview Romero in anticipation of him providing different testimony.  However, the prosecutor noted her frustration with defense counsel having twice called in ready, only to request additional continuances.  The court denied the

---

[2] The State initially included the charge of fourth degree assault, domestic violence, but later moved to amend the information and dismissed that charge.

continuance, citing the age of the case and the "de minimis" nature of Romero's involvement in the case.

*May 30 Readiness Hearing*

One week later, on the eve of trial, the court held another readiness hearing. Defense counsel again moved for a continuance citing his unsuccessful attempts to locate Romero and his belief that Romero would testify favorably to Sanchez. Defense counsel noted that the State had removed Romero from its third amended witness list. Defense counsel proffered a text message purportedly between Romero and Sanchez's mother indicating that Romero "never snitched on anyone" in his life, and stated that he thought this was important to repudiate Officer McNulty's expected testimony about Romero's identification of Sanchez at the scene.

The prosecutor then explained to the court that Romero had blocked a deputy prosecutor that attempted to arrange an interview on Facebook, and that Romero later deleted his Facebook. Additionally, she explained that Romero had earlier confirmed to the prosecutor that Officer McNulty's report about hearing Romero identify Sanchez was true. The prosecutor offered to play two jail calls between Sanchez and his mother and aunt, which the prosecutor contended would show that Sanchez knew where Romero was and that he made no efforts to get Romero to trial because Sanchez knew Romero would

testify against him.[3]  The prosecutor informed the court that the State would not be

calling Romero because he was an "incidental" witness and cited credibility problems.

The court then asked defense counsel "what efforts have been made prior to the

last four or five days" to find Romero.  Defense counsel responded that his investigator

had made attempts, but that Romero's phone number did not work and that Romero had

not responded to the investigator's letters.  Defense counsel thought Romero might be

unable to be reached because he was "on warrant status."  RP at 320-21.  The trial court

then denied the continuance, explaining that it thought Romero's potential testimony

seemed "highly irrelevant" and cited the fact that defense counsel had been on the case

for over one-and-a-half years.  The court added that defense counsel had failed to show

that he subpoenaed Romero and failed to include Romero in the defense's witness list.

Ultimately, Romero did not testify at trial.

Toward the end of the hearing, defense counsel pointed out that Sanchez was

shackled and requested that the shackles be removed.  The court noted that the shackles

were "just brought to [its] attention" and had Sanchez unshackled.  RP at 332, 335-37.[4]

---

[3] The trial court declined the prosecutor's request to play these jail calls, stating simply that it did not need to hear them to decide the continuance request.

[4] Additional facts related to the issue of Sanchez's shackling are discussed when analyzing the issue below.

5

*Trial*

During trial, Sanchez testified in his defense. He testified that he was not the driver, claiming he was working as a general contractor at a location two-and-a-half hours away at the time of the incident. He testified that the keys to the Sequoia were accessible to his employees, and that the Sequoia "should have been parked out by the barn" that morning, and that he never got the vehicle back. Sanchez also contested Officer McNulty's ability to identify him, citing poor lighting conditions at the location of the incident at night and the dark windows of the Sequoia. Sanchez denied interacting with Officer McNulty and denied knowing her first name, even though he acknowledged having "two or three" interactions with her in the past.

The jury began deliberations and, after approximately one-and-a-half hours, sent the court a question: "What is the procedure if the Jury cannot all come to [an] agreement?" Clerk's Papers (CP) at 255. Based on the parties' agreement, the court responded in writing, "The jury is instructed to continue its deliberations so long as there is a reasonable probability of reaching a verdict within a reasonable time." CP at 255.

The jury returned a verdict of guilty. The judgment and sentence indicate that the trial court found Sanchez to be indigent for the purposes of potential legal financial obligations and restitution.

Sanchez timely appeals.

6

ANALYSIS

1.  PRETRIAL SHACKLING

Sanchez argues that the trial court abused its discretion and violated his right to a

fair trial by failing to conduct an individualized inquiry before allowing him to be

shackled during a pretrial hearing.  He contends the error was not harmless beyond a

reasonable doubt, particularly because the court made discretionary rulings—such as

denying a continuance to locate Romero—that could have been impacted by the

shackling.  He claims the State cannot prove the error was harmless because it is

impossible to know how Romero's testimony might have affected the outcome.

The State counters that the trial court did not abuse its discretion because the court

did not order Sanchez to be shackled and was unaware he was restrained.  The State

argues that once the issue was raised, the court immediately ordered the shackles

removed, and thus, there was no error.  Even if the court erred, the State asserts, any such

error was harmless beyond a reasonable doubt.  We agree that there was no error.

*A.  Additional Background*

Toward the end of the May 30 readiness hearing, after the trial court had denied

the defense's motion for a continuance, defense counsel pointed out that Sanchez was

shackled and requested that they be removed:

> [DEFENSE COUNSEL]: Your Honor, my client is still shackled.  I
> would ask for him to be shackled—unshackled immediately.

7

[DEPUTY PROSECUTOR MYERS]: Your Honor, he was shackled because we had one officer in the courtroom was part of the problem.

THE COURT: No objection to unshackling him now?

[DEPUTY PROSECUTOR ST. CLAIR]: Not a big on it, but—

THE COURT: Well, this was just brought to my attention so that's fine, if you don't mind.

RP at 332. This was the only discussion of the shackles until the prosecutor brought the subject up again at the end of the hearing:

[DEPUTY PROSECUTOR ST. CLAIR]: And—and Your Honor, just to make a record on the shackling, as the Court noted, the jail staff is down. We have only one officer in the courtroom. There was no request to unshackle Mr. Sanchez, and frankly, given Mr. Sanchez's status, *etcetera*, may have objected to it anyway. But now that Mr. Sanchez is unshackled, given that the issue is being able to assist his counsel, if he needs more time, we're happy to give him that at this point, now that he's unshackled.

THE COURT: More time?

[DEFENSE COUNSEL]: Twenty-eight days' worth?

[DEPUTY PROSECUTOR MYERS]: No, not that much.

THE COURT: I know. Mr. Haas, do you need more time to confer with your client regarding any of these issues today?

[DEFENSE COUNSEL]: No, just with respect to shackling. He's gone through two jury trials. There have been no issues that I am aware of during any of those jury trials. And although we are sympathetic to jail staffing issues, that is not a basis for leaving somebody shackled.

[DEPUTY PROSECUTOR ST. CLAIR]: He's now serving twenty-three to life.

THE COURT: Okay. Well, and I'll note that as soon as it was brought to my attention it was—he was unshackled.

[DEFENSE COUNSEL]: He was promptly unshackled. Yeah. Yeah. And I just didn't notice, Your Honor. Sometimes I'm clueless.

THE COURT: Okay.

8

[DEPUTY PROSECUTOR MYERS]: One of the issues in *Jackson* was the—

THE COURT: Well,—

[DEPUTY PROSECUTOR MYERS]: —defendant's ability to confer with counsel would be diminished if they're shackled. So, what we're asking is if he needs more time to confer with his counsel right now, we're allowing that or we would recommend that.

THE COURT: And you've indicated you don't need more time, correct?

[DEFENSE COUNSEL]: No. No.

THE COURT: Okay.

RP at 335-37.

### B. Legal Standards

Under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution, a criminal defendant has a right to appear in court free from unjustified restraints during *all* stages of criminal proceedings, including nonjury pretrial hearings. *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). However, this right can be limited if "'some impelling necessity demands the restraint.'" *State v. Lundstrom*, 6 Wn. App. 2d 388, 393, 429 P.3d 1116 (2018) (quoting *State v. Williams*, 18 Wash. 47, 51, 50 P. 580 (1897)). Therefore, before restraining a defendant, the trial court "*must* engage in an individualized inquiry into the use of restraints prior to every court appearance." *Jackson*, 195 Wn.2d at 854.

Restraints are disfavored because placing restrictions on a defendant's mental and physical faculties when they appear in court "'may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial.'" *Jackson*, 195 Wn.2d at 852 (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)).  Moreover, our Supreme Court has recognized the "unknown risks of prejudice from implicit bias" that stem from restraints "and how [such bias] may impair decision-making." *Id.* at 856.

We review a trial court's decision to restrain a criminal defendant for an abuse of discretion. *Id.* at 850.  "A trial court abuses its discretion when its 'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *Id.* (internal quotation marks omitted) (quoting *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001)).  A trial court abuses its discretion and commits constitutional error by requiring a defendant to be restrained without an individualized inquiry into its need. *Id.* at 854-55.  Further, "'[a] broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be "potentially dangerous" is a failure to exercise discretion.'" *Id*. at 853 (quoting *Hartzog*, 96 Wn.2d at 400). When the trial court abuses its discretion in this context, the remedy is to reverse and remand for a new trial. *Id.* at 858.

10

## C. The Trial Court did not Abuse Its Discretion

Sanchez argues that his situation is legally and factually similar to *Jackson*. In *Jackson*, the trial court adopted and enforced a blanket shackling policy instituted by the sheriff's office requiring restraints on in-custody defendants at every court hearing. *Id*. at 845-47. Accordingly, Jackson was forced to wear physical restraints at every court hearing. *Id*. at 844. After Jackson's attorney objected, the trial court ruled that it would continue to defer to the jail's restraint policy until videoconferencing became available. *Id*. at 846. Our Supreme Court ultimately concluded that the trial court's failure to conduct an individualized inquiry into the necessity for the restraints was an abuse of discretion. *Id.* at 854-55.

Unlike in *Jackson*, the trial court here did not abuse its discretion or commit constitutional error. The court did not impose or endorse a shackling order, nor did it know Sanchez was restrained until defense counsel brought it to the court's attention. On appeal, Sanchez argues that the record is unclear as to whether the court knew about the shackles. This argument is unpersuasive. The trial court explicitly stated—twice—that it was unaware of the shackles until defense counsel raised the issue. Once the court was apprised of Sanchez's restraints, it immediately ordered them removed. "It is impossible for a trial court to abuse discretion it was never called upon to exercise." *Colorado Structures, Inc. v. Blue Mountain Plaza, LLC*, 159 Wn. App. 654, 660, 246 P.3d 835

11

(2011).  Having concluded that the trial court did not abuse its discretion, we need not

consider whether any error was harmless.

2.   DENIAL OF CONTINUANCE

Sanchez argues that the trial court erred in denying his motion for a continuance to

secure the testimony of Romero, whom he claims was a critical witness to counter the

State's theory that he was the driver of the Sequoia.  The State responds that the trial

court properly denied the motion, as the defense failed to exercise due diligence and

because Romero's testimony would not have been material.  We conclude that the trial

court did not abuse its discretion in denying the continuance, nor did the denial deprive

Sanchez of his constitutional rights.

*A.  Legal Standards*

A trial court's decision to grant or deny a continuance lies within its sound

discretion and is reviewed for abuse of that discretion.  *State v. Miles*, 77 Wn.2d 593,

597-98, 464 P.2d 723 (1970); *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169

(2004).  We will not disturb the trial court's decision unless the appellant makes a clear

showing that the trial courts discretion is "manifestly unreasonable, or exercised on

untenable grounds, or for untenable reasons."  *State ex rel. Carroll v. Junker*, 79 Wn.2d

12, 26, 482 P.2d 775 (1971).

"In exercising discretion to grant or deny a continuance, trial court's may consider

[several] factors, including surprise, diligence, redundancy, due process, materiality, and

maintenance of orderly procedure." *Downing*, 151 Wn.2d at 273; RCW 10.46.080;[5] CrR

3.3(f). "When a continuance is requested to locate a witness, the accused must show,

among other things, that the witness can *probably* be found if the continuance is granted,

and that due diligence has been used to obtain the witness' attendance." *State v. Lane*, 56

Wn. App. 286, 296, 786 P.2d 277 (1989).

A trial court's denial of a continuance may violate due process or the right to

compulsory process if it prevents the defendant from receiving a fair trial or from

presenting a material witness, and whether such a denial rises to a constitutional violation

must be evaluated on a case-by-case basis. *Downing*, 151 Wn.2d at 274-75.

---

[5] Under RCW 10.46.080, "A continuance may be granted in any case on the ground of the absence of evidence on the motion of the defendant supported by affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it; and also the name and place of residence of the witness or witnesses; and the substance of the evidence expected to be obtained, and if the prosecuting attorney admit that such evidence would be given, and that it be considered as actually given on the trial or offered and overruled as improper the continuance shall not be granted."

No copy of a written motion for the continuance is included in the record, and based on the hearing transcript, it seems that the motion was made orally. The failure of defense counsel to make a motion supported by affidavit as required by RCW 10.46.080 also precludes a finding of abuse of discretion. *See, e.g.*, *State v. Toliver*, 6 Wn. App. 531, 533, 494 P.2d 514 (1972) ("unless there is compliance with RCW 10.46.080, which requires that a written affidavit support a motion for a continuance on the ground of absence of evidence, setting forth the materiality and substance of the evidence, the name and residence of the witness and that due diligence has been used, it cannot be said that the trial court has abused its discretion.").

*B. Application*

In this case, the trial court did not abuse its discretion when it denied the defense's request for a continuance. The trial court's ruling that defense counsel failed to demonstrate sufficient diligence in securing Romero's presence at trial was reasonable. "Due diligence must be exercised to secure the attendance of a witness, and that due diligence includes the issuance of a subpoena and the taking of necessary steps to enforce attendance." *State v. Toliver*, 6 Wn. App. 531, 533, 494 P.2d 514 (1972). Here, although defense counsel described Romero's testimony as favorable, he did not subpoena Romero and made no further effort to locate him after an investigator was unable to reach him by phone or letter.

Sanchez argues that the defense was blindsided by the State's decision to not call Romero. However, nothing in CrR 4.7(a), which governs the prosecutor's discovery obligations, requires the State to call every witness on its witness list, and defense counsel has no right to rely on the witness list to its own detriment. If Romero's testimony was truly critical, the defense could have amended its own witness list and taken further steps to secure his presence well before trial. Given that the defense had known about Romero for months, the trial court's finding that counsel had not acted diligently was reasonable.

The trial court also reasonably found that Romero's proposed testimony was not material. Sanchez argues that Romero's testimony was critical to his defense, as it would

contradict the State's evidence identifying Sanchez as the driver of the Sequoia.

However, the record does not support that claim. The only potential support was a text

message allegedly from Romero to Sanchez's mother stating that he had never "snitched"

or "made a statement against anyone." CP at 191. This message did not directly state

that Sanchez was not the driver of the Sequoia, nor did it confirm that Romero had not

seen Sanchez in the vehicle. As the State puts it, at best the text message reflects Romero

denying that he told Officer McNulty that Sanchez was the driver, not that Romero

denied that Sanchez was the driver. The trial court was therefore well within its

discretion to find Romero's proposed testimony immaterial.

For these same reasons, the trial court's denial of Sanchez's motion for a

continuance did not amount to a constitutional violation. The defense failed to

demonstrate due diligence in attempting to secure the witness, and Romero's proposed

testimony was not shown to be material to the defense. Because the trial court's decision

did not prevent Sanchez from presenting a meaningful defense or result in the exclusion

of a crucial witness, his right to a fair trial and compulsory process was not infringed.

3. JURY INSTRUCTION ON DELIBERATIONS

For the first time on appeal, Sanchez contends that the trial court erred by

instructing the jury to continue deliberations after the jury's inquiry. He argues that the

jury was deadlocked and that the court's response coerced a guilty verdict, violating his

right to a fair trial. The State counters that the claim is unpreserved, no coercion occurred

15

because the jury was not deadlocked, and the trial court's instruction was proper.  We conclude that the trial court's response was not coercive or improper.  Accordingly, any alleged error is not manifest.

## A.  Error Preservation

We generally decline review claims of error not raised in the trial court.  RAP 2.5.  However, an exception to that rule permits a party to raise a "manifest error affecting a constitutional right" for the first time on appeal.  RAP 2.5(a)(3).  The constitutional right to a fair and impartial jury demands that a judge not place coercive pressure upon the deliberations of a jury in a criminal trial.  *State v. Boogaard*, 90 Wn.2d 733, 736-37, 585 P.2d 789 (1978).  Accordingly, our Supreme Court has explicitly held that claims of improper judicial interference with a verdict are reviewable as manifest constitutional errors.  *State v. Ford*, 171 Wn.2d 185, 188-89, 250 P.3d 97 (2011).  Thus, we proceed to review the merits of Sanchez's argument that this purported error is manifest.

## B.  Legal Standards

Under CrR 6.15(f)(2), "[a]fter jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate."

To prevail on a claim of improper judicial interference with the verdict, a defendant "'must establish a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention.'"  *Id.* (quoting *State v. Watkins*,

99 Wn.2d 166, 178, 660 P.2d 1117 (1983)). "This requires an affirmative showing and may not be based on mere speculation." *Id.* at 189. "We consider the totality of circumstances regarding the trial court's intervention into the jury's deliberations." *Id.*

Our Supreme Court set forth a five part test for a criminal defendant to prevail in a claim of judicial interference with the verdict:

> [A] defendant must first make a threshold showing that the jury was still within its deliberative process. Second, though related, the defendant must affirmatively show that the jury was at that point still undecided. Third, the defendant must show judicial action designed to force or compel a decision, and fourth, the impropriety of that conduct. Finally, if raised for the first time on appeal, a defendant must show that such interference rises to the level of manifest error, such that it actually prejudiced the constitutional right to a fair trial.

*Id.* at 193.

### C. Application of the Ford Test

Here, the parties agree that the first two parts of the *Ford* test are satisfied: the jury submitted its question mid-deliberations and had not yet reached a decision. The dispute centers on whether the court's response constituted coercive or improper conduct under the remaining parts.

The State asserts that Sanchez's argument relies on the premise that the jury was deadlocked, which the State denies. But whether the jury was formally "deadlocked" is not dispositive in this analysis. The *Ford* test does not require a deadlock—it requires only that the jury was still deliberating and undecided, which both parties concede. *Id.*

17

After considering the totality of the circumstances, we conclude that the trial court's response was not designed to force or compel a decision, nor was the court's conduct improper. The trial court carefully considered the jury's inquiry and consulted WPIC 4.70[6] and CrR 6.10 (governing jury discharge). The court's response was aimed at clarifying the procedure if the jury could not reach a verdict—not at compelling one. *See* RP at 729-30 ("Maybe we could use the . . . the jury is instructed to continue its . . . deliberations so long as there is a reasonable probability of reaching a verdict within a reasonable time. I mean, that's—if [the presiding juror is] wondering what the procedure is, that is generally the procedure.").

The instruction mirrored the language in WPIC 4.70 and explicitly avoided suggesting that a verdict was required or that deliberations must continue indefinitely. It properly conditioned continued deliberations on the jury's own assessment of whether further discussion might be productive. Because the response neither compelled a decision nor reflected improper judicial conduct, Sanchez's claim fails on the third and fourth parts of the *Ford* test.

Moreover, Sanchez fails to establish the fifth part of the *Ford* test: manifest error. An error is manifest when a defendant shows actual prejudice, which requires a plausible showing of practical and identifiable consequences during trial. *State v. WWJ Corp.*, 138

---

[6] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.70, at 157 (5th ed. 2021) (WPIC).

Wn.2d 595, 602-03, 980 P.2d 1257 (1999). "The focus of the actual prejudice must be on whether the error is so obvious [from] the record" that it warrants our review. State v. *O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009). "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *Id.* at 100.

Given the trial court's care in crafting its response—including referencing the model instruction and obtaining the parties' approval—any error was far from obvious. Defense counsel expressly agreed to the instruction, reinforcing that the error, if any, was not manifest. From the trial court's vantage point, nothing indicated that its response risked violating Sanchez's right to a fair trial. Placing ourselves in the trial court's position, considering what the court knew at the time—including the parties' agreement on the response—it is not clear that the trial court could have corrected the purported error.

Sanchez argues that the court erred by responding in writing rather than orally questioning the jury. While WPIC 4.70 is typically delivered orally, no authority requires it to be so, and Sanchez cites none. Moreover, oral questioning might have exerted undue pressure on jurors, especially since the jury had not indicated it was at an impasse. *See, e.g.*, *Boogaard*, 90 Wn.2d at 739 ("When [the trial court] called the jury into the courtroom, asked the foreman to disclose the history of the vote, asked for his opinion on

19

the probability of agreement within a half hour, and then inquired of each juror whether

or not he believed a verdict could be reached in that length of time, it was inevitable that

the minority jurors should feel the pressure of judicial influence.").

The trial court's response to the jury's inquiry was not error and therefore did not

violate Sanchez's right to a fair and impartial jury trial.

4.   APPELLATE COSTS

Sanchez preemptively objects to a potential award of appellate costs, should the

State prevail on appeal, based on his indigency.  The State argues that Sanchez failed to

cite to the record to establish his indigency, but defers to this court should Sanchez prove

his indigency.  In reply, Sanchez points out that the sentencing court found him to be

indigent.  We exercise our discretion and decline to impose appellate costs on Sanchez.

The ability to pay is a key consideration in the discretionary imposition of

appellate costs, though it is not the sole factor.  *State v. Sinclair*, 192 Wn. App. 380, 389,

367 P.3d 612 (2016).  Once indigency is established, the RAPs create a presumption of

continued indigency throughout the appeal.  *Sinclair*, 192 Wn. App. at 393.  In

considering appellate costs, this court has recognized that imposing costs on indigent

defendants raises significant concerns, including the increased difficulty in reentering

society, the limited likelihood of recouping the money by the government, and the

inequities inherent in the process.  *Sinclair*, 192 Wn. App. at 391; *State v. Blazina*, 182

Wn.2d 827, 835, 344 P.3d 680 (2015).

Sanchez was appointed counsel at trial and the trial court found him indigent at sentencing. This is sufficient evidence of his indigency. In the absence of evidence showing any significant improvement in his financial condition, Sanchez is entitled to the presumption of continued indigency during the appeal.

5. STATEMENT OF ADDITIONAL GROUNDS

Sanchez raises three issues in his SAG. We address them in turn, following a brief review of the standards governing our consideration of SAGs.

Under RAP 10.10(a), a defendant may file a pro se SAG. However, our review of a SAG is subject to several limitations. First, we generally consider only issues raised in a SAG that adequately inform us of the nature and occurrence of the alleged errors. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). Second, we only consider arguments that are not repetitive of briefing. RAP 10.10(a). Third, we decline to consider issues that rely on facts or evidence outside the record, as such claims must be raised in a personal restraint petition (PRP), not through a SAG. *Alvarado*, 164 Wn.2d at 569.

Sanchez first contends that the State improperly assumed jurisdiction over an offense committed on the Colville Tribe's reservation by a tribal member. This argument fails. Where the location of a crime is not in dispute, jurisdiction is a question of law that we review de novo. *State v. Waters*, 93 Wn. App. 969, 976, 971 P.2d 538 (1999). Under RCW 37.12.030, the state of Washington has assumed jurisdiction over all criminal

offenses committed by Native Americans operating motor vehicles on public roads within Indian lands. *E.g.*, *State v. Abrahamson*, 157 Wn. App. 672, 683-85, 238 P.3d 533 (2010) (concluding that the superior court had jurisdiction over a tribal member's driving offenses, including attempting to elude, that occurred on tribal lands). Accordingly, the State had jurisdiction over Sanchez's attempting to elude charge.[7]

Next, Sanchez argues that he was unable to see or hear court proceedings during questioning by the prosecutor and defense counsel. He claims he was shackled in a separate room without the ability to privately communicate with his attorney. To the extent he asserts he could not see or hear the proceedings, the record does not contain any information about his physical location or his ability to observe or hear the hearings. Because this claim may depend on evidence outside of the record, it is more appropriately raised in a PRP. *Alvarado*, 164 Wn.2d at 569. To the extent Sanchez challenges his shackling during the pretrial hearing as a violation of his right to a fair trial, the issue is repetitive of arguments raised in the briefing and already addressed by this court. RAP 10.10(a).

---

[7] Defense counsel specifically declined to raise this issue during pretrial motions because he believed the jurisdictional defense would fail in this case. At that point in time, Officer McNulty testified that she had a county commission, federal commission, and tribal commission. Further, the trial court correctly ruled that it had jurisdiction of criminal offenses over tribe members on state roads under RCW 37.12.010.

Last, Sanchez argues that "[due] process investigation was not followed" because Officer McNulty "did not provide a CAD[8] of the vehicle" and "could not identify my SUV in [daylight]." SAG at 2. Because he raises this argument for the first time on appeal, we decline review. RAP 2.5(a). Moreover, his argument fails to adequately inform us of the nature and occurrence of the alleged errors. *Alvarado*, 164 Wn.2d at 569.

We affirm Sanchez's conviction but decline to impose appellate costs against him due to his indigency.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Cooney, J.

---

8 Computer-aided dispatch.